# UNITED STATES v. ERIE RAILROAD COMPANY.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 552.    Argued December 14, 1914.—Decided January 5, 1915.

*Quære*, whether § 184, Penal Code, prohibiting the carriage of letters or packets otherwise than in the mail by carriers on post routes, except under certain specified conditions, is penal or remedial, or whether it is to have a liberal or strict construction.

Letters of officers of the carrier, a railroad company, to officers of the telegraph company with which it has a contract and in whose business it participates, relating to immediate and day by day action, is current, as distinguished from exceptional, business and falls within the permitted exceptions of § 184, Penal Code.

THE facts, which involve the construction of § 184 of the Penal Code of the United States, prohibiting, except under specified conditions, the carriage of letters and packets otherwise than in the mails, are stated in the opinion.

*Mr. Assistant Attorney General Wallace*, with whom *The Solicitor General* was on the brief, for the United States:

Section 184 is a revenue statute and should be liberally

construed. *United States* v. *Bromley*, 12 How. 88; *Johnson* v. *Railway*, 196 U. S. 17; *United States* v. *36 Bbls. Wine*, 7 Blatch. 463; 4 Ops. A. G. 161.

The letters carried were not related to current business of the railroad. In fact neither letter related to the railroad company's business.

The agreement throughout distinguishes between the railroad and the telegraph company's business. *West. Un. Tel. Co.* v. *Penna. Co.*, 129 Fed. Rep. 867; 21 Ops. A. G. 400.

Section 184 is not essentially penal in its nature, but is rather remedial, its main purpose being to preserve the revenues of the United States, and the great establishment which has been built up under the statutes of the United States for the benefit of the whole people. *United States* v. *Bromley*, 12 How. 88.

A statute passed for the purpose of protecting the revenues of the United States is not to be strictly construed, even where it provides a severe penalty. *Johnson* v. *Southern Pacific Co.*, 196 U. S. 1; *United States* v. *36 Barrels of Wines*, 7 Blatch. 459, 463; 4 Ops. Att'y Gen'l, 159, 161, 162.

Construing § 184 fairly, these letters did not relate "to current business" of the defendant.

From 1825 on Congress has endeavored to protect the governmental monopoly in the carriage of the mails by prohibiting entirely such carriage by private expresses and prohibiting it generally to private parties except in the cases where the letters related to the articles being conveyed at the same time.

Every word of the statute must be given some meaning; "current" was added as a word of limitation.

Neither of the letters set out in the indictment related to such business. Even if they related to the railroad company's business at all they evidently did not relate to its passing, present business.

*Mr. Rush Taggart* for defendant in error:

Both of the letters in question relate to the "current business" of the Erie Railroad Company and there was no violation of Penal Laws, § 184. See § 5263, Rev. Stat.; *Pensacola Tel. Co.* v. *West. Un. Tel. Co.*, 96 U. S. 1; *West. Un. Tel. Co.* v. *Massachusetts*, 125 U. S. 530; *United States* v. *Un. Pac. Ry.*, 160 U. S. 1; *West. Un. Tel. Co.* v. *Penna. R. R.*, 195 U. S. 540.

Penal Laws, § 184, has not yet received judicial construction. It is practically a reënactment of § 3985, Rev. Stat., in force for a great many years before the codification of the penal laws, which was construed by Attorney General Harmon as intended only to prohibit the transportation of communications between third parties, and that it did not prohibit the transportation of communications, whatever their substance, belonging to the carrier or relating to its business. 21 Ops. Atty. Gen. 394.

As to significance of the word "current" as used in the statute, see *Thomas* v. *Peoria &c. R. R.*, 36 Fed. Rep. 808, 819; *Taylor* v. *Mayo*, 110 U. S. 330.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Indictment in two counts against the railroad company for carrying otherwise than in the mails certain letters in violation of § 184 of the Penal Code of the United States. The section is as follows:

"SEC. 184. Whoever, being the owner, driver, conductor, master, or other person having charge of any stagecoach, railway car, steamboat, or conveyance of any kind which regularly performs trips at stated periods on any post route, or from any city, town, or place to any other city, town, or place between which the mail is regularly carried, and which shall carry, otherwise than in the mail, any letters or packets, except such as relate to some part of the cargo of such steamboat or other vessel, to the current

business of the carrier, or to some article carried at the same time by the same stagecoach, railway car, or other vehicle, except as otherwise provided by law, shall be fined not more than fifty dollars.".

The counts are similar except as to the letter carried. The indictment alleged that the railroad between designated points (Jersey City, N. J., and Montgomery, N. Y.) regularly made trips; that it had made a contract with the Western Union Telegraph Company by which provision was made for a joint operation of telegraph lines over the right of way of the railroad company; that the business was under the supervision of a joint superintendent named E. P. Griffith, and that the telegraph office at Montgomery—both for railroad and commercial business—was in charge of G. A. Osborne, the station agent of the railroad; that on June 27, 1912, the railroad carried otherwise than in the mails the following letter:

"June 27, 1912.

"Mr. G. A. Osborne,

"Agent, Erie Railroad and Manager W. U. T. Co.,

"Montgomery, N. Y.

"Dear Sir: The revenue of the W. U. T. Co.'s receipts at Montgomery, N. Y., would indicate that the new telegraph service, such as day and night letters, had not been thoroughly presented to the people of Montgomery. At many of the Erie Railroad stations similar to Montgomery very handsome increases in telegraph receipts have been shown on account of this new service and as the Erie Railroad participates in the telegraph revenues from its railroad stations it is desired that their revenue from the telegraph company shall increase as well as the revenue from its freight and passenger traffic, and I hope you will do everything to make such showing.

"Yours truly,

"(Sd.) E. P. Griffith,

"Supt. of Telgh."

The letter upon which the second count is based was as follows:

"Mr. G. A. Osborne,                    "June 27, 1912.
    "Agent Erie Railroad Co. and Manager W. U. Tel. Co.,
        "Montgomery, Orange County, N. Y.

"Dear Sir: I forwarded to you by train mail on June 20th a copy of the new Western Union Telegraph Company's tariff book, which shows a considerable number of changes in telegraph rates, particularly with respect to the old 40-cent rate having been reduced to 30 cents to a considerable number of points, and I would ask that you familiarize yourself with the new rates in order to avoid check errors. The misquoting of rates creates a large number of error sheets and correspondence, and not only confuses the auditing department of the W. U. Tel. Co., but also delays settlements between the Telegraph Company and the Erie Railroad.

"As you are aware, the Erie Railroad receives a percentage of the W. U. Tel. Co.'s telegraph receipts at all Erie railroad stations, where the agent of the railroad, under contract with the telegraph company, also acts as the agent or manager of the telegraph company, and that the handling of Western Union telegrams, in making up of Western Union reports, from which the railroad company's proportion of receipts are figured, and all of the accounting and correspondence relative to Western Union matters are as much the current business of the railroad as handling accounts or reports made in connection with the freight shipments or sale of tickets for the railroad, the railroad company receiving a revenue from all.

"Your attention is specially called to modification of Rule No. 8 for the instructions to all New York State offices only and to be used instead of Rule 8, printed in the tariff book, printed copy of which I enclose herewith.

                    "Yours truly,
            "(Sd.)   E. P. Griffith, "Supt. of Telgh."

The indictment was demurred to by the railroad company on the ground that the matters set forth therein were not sufficient in law to constitute a crime. The demurrer was sustained, the court expressing itself to be "clearly of the opinion that the 'current business of the carrier' referred to in section 184 is the kind of business in which it appears from the indictment the carrier was engaged, and that the sending of the letters in question was in accordance with law."

The opinion of the court exhibits the point in the case, to which, though a short one, considerable argument has been addressed by counsel. The solution of it is in the contract between the companies.

It is a very elaborate document, regulating the relations of the railroad and telegraph companies by a variety of provisions and details. By it the railroad company leased to the telegraph company the right to maintain the telegraph line it (the railroad company) then had, and operate the same and the right to build new lines. One wire was to be provided for railroad use and one for commercial use, though joint wires were to be used where nothing more was required.

Article 6 of the agreement is especially relied on by the railroad company. It provides that at all telegraph offices now or hereafter maintained at the stations of the railroad company it shall, at its own expense, furnish office room, light and heat for telegraph service and also at its own expense provide an operator and other employés, who, acting as agents for the telegraph company, shall receive, transmit and deliver, exclusively for the telegraph company, such commercial and public messages as may be offered and shall charge the telegraph company's tariff rates thereon and shall render to the telegraph company monthly accounts thereof, the railroad company to pay all of such receipts to the telegraph or other employés but not to be responsible

for the failure of its operators to pay over such receipts.

The telegraph company agrees to pay the railroad company as soon as practicable after the close of each month 25% of the cash receipts, at offices in the railroad company's stations or other public buildings, received from commercial or public messages of the telegraph company, with certain exceptions not material to mention, and transmit free telegrams relating to railroad business, the railroad company to carry materials, furnish offices and operators, pay for certain lines, and give exclusive privileges, as far as possible to the telegraph company. The railroad company is given the right to investigate the accounts of the telegraph company so far as they relate to such earnings. Either party may discontinue any of its offices. If the telegraph company removes any of its offices from the railroad company's stations the latter company shall still have the right to continue doing a commercial business in such station, and the telegraph company will provide the usual signs for such business, the railroad company not to solicit business in competition with the telegraph company.

By the twelfth article it is provided that the telegraph lines and wires and the offices and operators in railroad stations shall be under the supervision and control of a competent joint superintendent of telegraph who shall be appointed by the railroad company subject to the approval of the telegraph company and be paid jointly and equally by both companies at a salary to be fixed by both, each company paying one-half thereof. Either company may discharge the joint superintendent, but his successor can only be appointed on the written consent of both parties. By the ninth article it is expressly covenanted and agreed that the joint superintendent and all other persons engaged in the work contemplated by the agreement, by whichever company paid, shall be deemed

to be the servants of the telegraph company except when engaged in the transmission of messages for the railroad company and in certain construction work.

It will be observed that while the companies in many respects are independent they are also, in some respects at least, dependent. The telegraph is a facility of the railroad company and necessary to its operations, the telegraph company doing what the railroad company did for itself before the agreement and but for the agreement with the telegraph company would have to do. The railroad company has an interest in the receipts of the other company and is concerned in their amount and the maintenance and increase of the telegraph business. The control of the telegraph company's instrumentalities and its offices and operators is in a "competent joint superintendent of telegraph," in whose appointment the railroad company has a voice and whom it also may discharge. It is, however, not possible, and keep this opinion within a reasonable length, to detail the many ways in which the two companies are related, and while it may be said that there is a railroad business in which the telegraph company has no concern, that is, business distinctly railroad, yet it is also so far concerned with the telegraph business as to make its efficient and successful operation of interest to it. To promote such operation was the purpose of the two letters which are the basis of the indictment, and the business comes within the description of the statute and is "current."

In reaching this conclusion it is not necessary to consider the character of the statute, whether it be penal or remedial, or whether it is to have a strict or a liberal construction. It is one justified by the words of the statute and in view of the facts by its history, and is not precluded by anything that was said at the time the act was amended. As originally enacted and carried into the Revised Statutes (§ 3985) it forbade the carrying, "other-

wise than in the mail, any letters or packets, except such as relate to some part of the cargo of such steamboat or other vessel, or to some article carried at the same time by the same stage-coach, railway car, or other vehicle."

The section coming before the Attorney General for construction, the opinion was expressed that it only intended to prohibit the transportation of communications between third parties and did not prohibit the transportation of communications, whatever their substance, belonging to the carrier or relating to the carrier's business. 21 Op. Atty. Genl. 394. It is the contention of the Government that when § 184 came to be enacted that construction was narrowed by the use of the word "current," Senator Bacon, who suggested it, in effect so declaring, and urged it as an amendment so that the new section might not relate, as the senator said, to the "financial transactions" of the carriers, "or anything of that kind, but to current business and operations." To this comment counsel for the Government adds the definition of "current" from the dictionaries as "now passing; present in its course; as the current month or year"; and supposes this to be the meaning which was in Senator Bacon's mind and urges the view that "the 'current business' of the carrier, therefore, is that business which is, at any particular time, in the present course of its transactions." But so confined in meaning it is not very clear what enlargement the new section is on the old one. We cannot so confine it. The statute certainly cannot mean that the described business should have no relation to the past and no connection with the future, however near. It may be that there might be a business so completely consummated or so much in speculation that it could not be described as "current," but the letters with which this case is concerned are not of either character. They regard not only immediate but day-by-day action and so

relate to "current," as distinguished from exceptional business.

*Judgment affirmed.*

MR. JUSTICE McREYNOLDS took no part in the consideration and decision of the case.