# REGENTS OF THE UNIVERSITY OF CALIFORNIA
## v. PUBLIC EMPLOYMENT RELATIONS BOARD ET AL.

No. 86–935.   Argued January 12, 1988—Decided April 20, 1988

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, BLACKMUN, and SCALIA, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 603. STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 604. KENNEDY, J., took no part in the consideration or decision of the case.

*James N. Odle* argued the cause for appellant. With him on the briefs were *James E. Holst, Susan M. Thomas*, and *Kingsley R. Browne.*

*Christopher J. Wright* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Lauber, Anthony J. Steinmeyer*, and *Charles D. Hawley.*

*Andrea L. Biren* argued the cause for appellees and filed a brief for appellee California Public Employment Relations Board. *Andrew Thomas Sinclair* filed a brief for appellee Wilson.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case presents the question whether a state university's delivery of unstamped letters from a labor union to university employees violates the Private Express Statutes, 18 U. S. C. §§ 1693–1699, 39 U. S. C. §§ 601–606. These statutes establish the postal monopoly and generally prohibit the private carriage of letters over postal routes without the payment of postage to the United States Postal Service.

I

Appellant Regents govern a large state-owned university with over 100,000 employees. The university (hereafter referred to as appellant) operates an internal mail system to facilitate the delivery of mail to the various sites on its campuses. Appellant's employees collect mail originating on the campuses from many mail depositories and take it to a central location for sorting. The mail is separated into three groups: (1) mail already bearing United States postage; (2) unstamped internal university mail; and (3) other unstamped mail. Group (1) is delivered to the Postal Service without further handling by appellant. Group (2) is monitored to ensure that it includes only official university mail. Group (3) is examined for any letters addressed to university destinations that come within an exception to the Private Express Statutes and can therefore be delivered by the appellant without postage. Appellant affixes United States postage to

---

*Briefs of *amici curiae* urging affirmance were filed for the American Federation of State, County, and Municipal Employees, AFL–CIO, by *Richard Kirschner;* for the American Federation of Teachers by *Lawrence A. Poltrock* and *Gregory N. Freerksen;* for the California Faculty Association by *Julius Reich* and *Glenn Rothner;* and for the National Educational Association et al. by *Robert H. Chanin* and *Kirsten Zerger.*

the remainder of mail in group (3) and delivers it to the Postal Service, then charges the senders for the costs involved.

In late 1979, appellee William H. Wilson, president of appellee Local 371 of the American Federation of State, County, and Municipal Employees (Union), attempted to use appellant's internal mail system to send unstamped letters from the Union to certain employees of appellant. The Union represented these employees and had filed a request for recognition of a bargaining unit. A subsequent unit determination, however, placed these employees in a different bargaining unit. Brief for Appellee Wilson 2, n. 2. Appellant refused to carry the letters in its internal mail system on the ground that the Private Express Statutes prohibited such carriage. Believing that this refusal violated a state law, the Higher Education Employer-Employee Relations Act (HEERA), Cal. Govt. Code Ann. §§ 3560–3599 (West 1980), Wilson and the Union filed an unfair labor practice charge with appellee California Public Employment Relations Board (PERB), the state agency charged with interpretation and enforcement of HEERA.

Before PERB, appellant argued that the carriage of the Union letters would violate the Private Express Statutes; it relied on an advisory opinion from the United States Postal Service to that effect. Advisory Op., PES No. 82–9 (July 2, 1982), App. to Juris. Statement A66. Wilson and the Union in turn argued that refusal to carry the letters violated HEERA's requirement that employers grant unions access to their "means of communication." PERB initially declined to consider the federal law issues pressed by appellant and held that HEERA required delivery of the letters. The California Court of Appeal agreed with PERB's determination that denial of access violated HEERA, but noted that the HEERA right of access was expressly subject to "reasonable regulations." 139 Cal. App. 3d 1037, 1041, 189 Cal. Rptr. 298, 300–301 (1983). The court found an unresolved factual issue, namely, whether appellant's denial of

access was a "reasonable regulation" in light of all the surrounding circumstances, including the Private Express Statutes. It therefore remanded the case back to PERB for consideration of this issue. *Id.*, at 1042, 189 Cal. Rptr., at 301. On remand, PERB found this HEERA requirement to be consistent with federal law because it determined that the carriage involved was within two different exceptions to the Private Express Statutes, namely the "letters-of-the-carrier" exception, 18 U. S. C. § 1694; 39 CFR § 310.3(b) (1987), and the "private-hands" exception, 18 U. S. C. § 1696(c); 39 CFR § 310.3(c) (1987).[1]

The California Court of Appeal affirmed. 182 Cal. App. 3d 71, 227 Cal. Rptr. 57 (1986). The court concluded that the "letters-of-the-carrier" exception permitted the delivery of the Union's letters through appellant's internal mail system. In light of this conclusion, the court declined to address the "private-hands" exception. *Id.*, at 77, 227 Cal. Rptr., at 60. The California Supreme Court denied appellant's petition for review. App. to Juris. Statement A–13. We noted probable jurisdiction, 483 U. S. 1004 (1987), and now reverse.

## II

Congress enacted the Private Express Statutes pursuant to its constitutional authority to establish "Post Offices and post roads," U. S. Const., Art. I, § 8, cl. 7. In general these statutes establish the United States Postal Service as a monopoly by prohibiting others from carrying letters over postal routes.

---

[1] The Postal Service is authorized to suspend the operation of the Private Express Statutes when required by the "public interest," 39 U. S. C. § 601(b). In this case, PERB also found that the Postal Service's "suspension" for letters of *"bona fide* student or faculty organizations," 39 CFR § 320.4 (1987), applied to the letters involved here and therefore permitted their carriage by appellant. The California Court of Appeal did not address this ground and PERB has expressly declined to press it before this Court. Brief for Appellee PERB 16, n. 9. Accordingly, we do not consider the applicability of the suspension.

A postal monopoly has prevailed in this country since the Articles of Confederation, see Act of Oct. 18, 1782, 23 J. Continental Cong. 672–673 (G. Hunt ed. 1914), and Congress embraced the concept in its first postal law, see Act of Feb. 20, 1792, ch. 7, § 14, 1 Stat. 236. Because Congress desires "prompt, reliable, and efficient services to [postal] patrons in *all* areas," 39 U. S. C. § 101(a) (emphasis added), it has enacted the Private Express Statutes and has provided for nationwide delivery of mail at uniform rates.

There is no doubt that the general prohibition would apply to the carriage involved here, see 18 U. S. C. §§ 1693, 1694, so the central issue is whether such carriage is within one of the numerous exceptions to the Private Express Statutes. Appellees urge that both the "letters-of-the-carrier" and "private-hands" exceptions apply. We consider each in turn.

### A

The letters-of-the-carrier exception is founded on the portion of 18 U. S. C. § 1694 italicized below:

> "Whoever . . . carries, otherwise than in the mail, any letters or packets, *except such as relate . . . to the current business of the carrier* . . . shall, except as otherwise provided by law, be fined not more than $50." (Emphasis added.)

It is this exception that allows appellant to operate an internal mail system at all. To fall within the exception, the face of the statute requires that the letters "relate" to the "current business" of the carrier. Precisely what constitutes a carrier's "current business" is not further described. The ordinary sweep of the term, however, falls far short of encompassing the letters involved in this case. The letters relate to the Union's efforts to organize certain of appellant's employees into a bargaining unit. This is a subject in which appellant certainly is interested, but it is also a subject which can be accurately described only as the Union's current business, not appellant's. It strains the statutory language to

contend that the phrase "current business" includes such activity.

Appellees argue that California has through HEERA made harmonious labor relations the business of its state universities, and thus in a sense the Union's business *is* the university's business. Cf. Cal. Govt. Code Ann. § 3560(a) (West 1980) ("fundamental interest in the development of harmonious and cooperative labor relations"). To be sure, a State generally is free to define the nature of its institutions and the scope of their activities as it sees fit. But this principle must have some limits in this context for, otherwise, a State could define delivery of mail to all its citizens as the "current business" of some state agency and thereby defeat the postal monopoly. Appellees are urging far too expansive a reading of the statute. We rely on the normal meaning of the language chosen by Congress and conclude that the letters-of-the-carrier exception does not permit appellant to carry the Union's letters.

The legislative history confirms our reading of the statutory language, making clear that the exception is a narrow one. Congress added the letters-of-the-carrier exception to the Private Express Statutes in 1909. Until that time, the prohibition on private carriage was unqualified. The new exception responded to an Opinion of the Attorney General rendered in 1896. 21 Op. Atty. Gen. 394, 397–399. That opinion concerned a Postal Department regulation that allowed railroads to carry their own mail. The Attorney General said that the regulation was valid because two conditions were present. First, the letters were related to the carrier's business. Second, the letters were "letters sent by or addressed to the carrying company, or on its behalf." *Id.*, at 400. The Attorney General concluded that without the second condition, the implied exception would be too broad.

Congress generally approved of the Attorney General's decision, but some Members found the exception difficult to square with the express, unqualified language of the statute.

See 42 Cong. Rec. 1901–1905 (1908). Therefore a movement began to amend the statute to include the present exception for letters that relate to "the current business of the carrier." *Id.*, at 1976. See Act of Mar. 4, 1909, ch. 321, § 184, 35 Stat. 1124. Senator Sutherland, the sponsor of the specific amendment, explained its intent:

> "I move that amendment because I think that it puts in express language precisely what the section means as it stands without it . . . . I think the opinion of the Attorney-General . . . gives the correct construction to this section. The section is dealing with the carrying of mail for others. It is not dealing with the question of the carrying of the mail for the carrier itself." 42 Cong. Rec. 1976 (1908).

The House Report reflected a similar intent that the amendment put the statute "in exact conformity with the construction placed upon existing law." 43 Cong. Rec. 3790 (1909) (referring to 21 Op. Atty. Gen. 394 (1896)).

This history suggests an intention to codify the Attorney General's construction. That construction includes a requirement that the letters be "sent by or addressed to the carrying company, or on its behalf," to qualify for the letters-of-the-carrier exception. 21 Op. Atty. Gen., at 400. See also 29 Op. Atty. Gen. 418, 419 (1912) ("Congress has imposed two conditions upon the free transportation of letters outside the mail: First, that the letters should be the letters of the carrier itself; and second, that they should relate to its own current business"); 28 Op. Atty. Gen. 537 (1910).

Our only previous decision concerning the letters-of-the-carrier exception, *United States* v. *Erie R. Co.*, 235 U. S. 513 (1915), is consistent with a narrow view of the statutory language. *Erie* involved carriage by a railroad of letters concerning a joint venture between the railroad and a telegraph company. The Court simply held that the "business of the carrier" included the business of the joint enterprise. *Erie* therefore sheds no light on the proper construction of the

statute in this quite different context.  Moreover, the specific letters involved in *Erie* fall within our view of the proper scope of the statute.  They were written by an employee of the railroad in his official capacity and addressed to other employees in their capacities as representatives of the railroad.

Particularly in light of the clarifying legislative history, we conclude that the letters-of-the-carrier exception is far narrower than appellees would have it.  Cf. *Tanner* v. *United States*, 483 U. S. 107, 125 (1987); *Dixson* v. *United States*, 465 U. S. 482, 491–496 (1984).  Whether or not it can be read to include a requirement that the letters be written by or addressed to the carrier, a question we need not reach, it is at least limited to "business of the carrier" that is closer to the carrier's own affairs than the letters involved here.  The alleged "business" in this case is not close enough to appellant's affairs to be the natural subject of letters concerning appellant's "current business."  Accordingly, we hold that the letters-of-the-carrier exception does not permit appellant to carry the Union's letters.

### B

The private-hands exception derives from 18 U. S. C. § 1696(c):

> "This chapter shall not prohibit the conveyance or transmission of letters or packets by private hands without compensation."

From its inception, the monopoly granted the Postal Service had always been limited to the carriage of mail "for hire." See Act of Oct. 18, 1782, 23 J. Continental Cong. 670, 672–673 (G. Hunt ed. 1914); Act of Feb. 20, 1792, ch. 7, § 14, 1 Stat. 236.  The private-hands exception is a reflection of the limited nature of the monopoly; it was designed to ensure that private carriage is not undertaken "for hire or reward." *Ibid.*  While the limited nature of the postal monopoly always implied that private, gratuitous carriage was excepted from the prohibitions of the Private Express Statutes, Con-

gress made the exception express in 1845, at a time when it was greatly concerned with the dwindling revenues of the Postal Service. See S. Rep. No. 137, 28th Cong., 1st Sess., 1, 10 (1844); H. R. Rep. No. 477, 28th Cong., 1st Sess., 1 (1844). To increase postal revenues, Congress lowered prices and limited franking privileges. Congress also sought to boost revenues by eliminating competition. Therefore, it strengthened the general prohibition on private carriage, intending to "put an end to all interference with the revenues of the department" from that source. S. Rep. No. 137, *supra*, at 10. Against this backdrop, Congress developed a narrow exception for carriage by "private hands," crafting the exception in such a way as to permit only gratuitous carriage undertaken out of friendship, not pursuant to a business relationship. H. R. Rep. No. 477, *supra*, at 4 ("Penalties are provided . . . with exceptions in favor of the party . . . who conveys the letter out of neighborly kindness, without fee or reward").

Congress used unambiguous language to accomplish its goals. Persons or entities other than the United States Postal Service—*i. e.*, "private hands"—may carry letters without violating the Private Express Statutes only so long as they do not receive any form of benefit from the sender—*i. e.*, "without compensation." While the pivotal term, "compensation," is not further defined, Congress in no way qualified its reach. We therefore give effect to congressional intent by giving the language its normal meaning. A dictionary from the period during which the private-hands exception was enacted illustrates the general nature of the term; it defines compensation to include "that which supplies the place of something else" and "that which is given or received as an equivalent for services, debt, want, loss, or suffering." N. Webster, An American Dictionary of the English Language 235 (C. Goodrich ed. 1849). Accordingly, we hold that the private-hands exception is available only when

there is no compensation of any kind flowing from the sender to the carrier.

A business relationship between the two parties may render the exception unavailable, because acts undertaken in the course of such a relationship may involve an exchange of benefits or a *quid pro quo*.[2]   Congress understood this point. Early in the debates on the 1909 amendments to the Private Express Statutes, which added the letters-of-the-carrier exception, Senator Sutherland expressed concern that adding such an exception would permit railroads to agree to carry mail for each other.   He was concerned that by undertaking such carriage pursuant to "some common understanding," the railroads "would not be carrying for compensation." Senator McLaurin, one of the supporters of amendment, responded: "[A]n arrangement of that kind . . . would itself be for compensation.   It would be a quid pro quo and it would violate the law."   Senator Sutherland evidently accepted this view for, as noted above, he sponsored the actual amendment that became the letters-of-the-carrier exception.   The construction Congress placed on the private-hands exception is perhaps best summarized through Senator McLaurin's statement that an exception for carriage without compensation was intended solely to permit "an innocent man . . . to do a favor to some[one]."   42 Cong. Rec. 1905 (1908).   A business relationship ordinarily converts such "favors" at the very least into implicit attempts to further the business relationship.

The private-hands exception consistently has been interpreted as not authorizing carriage pursuant to a business relationship.   Thus, "compensation" has been read to encom-

---

[2] Contrary to the suggestion in the dissent, *post*, at 611–612, n. 5, this qualified statement obviously does not purport to render the private-hands exception automatically inapplicable whenever a business relationship exists.   Rather, it simply indicates that a business relationship *ordinarily* suggests that the carriage is not without compensation.   Cf. 39 CFR § 310.3(c) (1987).

pass the nonmonetary consideration that is implicit in a business relationship. *United States* v. *Thompson,* 28 F. Cas. 97 (No. 16,489) (DC Mass. 1846). *Thompson* involved the prosecution of the proprietor of a delivery service for carrying letters along with other merchandise. The defendant argued that he carried letters only in connection with delivery of other merchandise and that he received no additional compensation for carrying the letters with the merchandise. In essence, the defendant contended that he carried the letters only as a gesture of good will. The court rejected this argument, holding that the statute did not permit the carriage of letters "as a part of his business of a merchandise express, although no charge was made for letters as such." *Id.,* at 98.

The Attorney General took a similar view of the exception's scope when he opined that railroads could not agree to carry each other's mail, because the "express or implied obligation of railroads to carry letters for each other . . . would amount to 'compensation' within the meaning of the statute." 21 Op. Atty. Gen., at 401.

Applying this well-established construction to the situation at hand, we conclude that appellant's carriage of the Union's letters would not be "without compensation." Appellees initially argue that there would be no compensation because the Union would not pay appellant specifically to carry the letters. This obviously gives far too restrictive a reading to the term "compensation." That term includes indirect as well as direct compensation. If we read the exception to include any private carriage so long as no direct payment is made, it quickly would swallow the rule; senders and carriers could manipulate their relationships to avoid direct compensation and thereby evade the Private Express Statutes.

Appellees also argue that compensation would be lacking because appellant merely would perform a mandatory duty imposed by state law. This lack of legal consideration, appellees argue, demonstrates that the carriage is not part of any business relationship. As a matter of general con-

tract law, it may be true that performance of a legal duty cannot constitute legal consideration. Common-law notions of consideration, however, do not control the interpretation of this statute. Congress, after all, used the generic term "compensation," which can include less direct exchanges of benefits.

Here there is an arm's-length business relationship between the Union and the employees on the one side and appellant on the other. By delivering the Union's letters, appellant would perform a service for its employees that they would otherwise pay for themselves, through their union dues. This service would become part of the package of monetary and nonmonetary benefits that appellant provides to its employees in exchange for their services. In our view, carriage of the Union's letters pursuant to such an exchange of benefits necessarily means that the carriage is not "without compensation." Accordingly, it does not fall within the private-hands exception.

### C

The parties and the United States as *amicus curiae* have focused their arguments largely on Postal Service regulations construing the letters-of-the-carrier and the private-hands exceptions. With respect to the letters-of-the-carrier exception, the Postal Service has consistently read the statute to require that the letters be written by or addressed to the carrier. Even before the Service issued formal regulations, it espoused this view in periodic pamphlets it published describing the reach of the Private Express Statutes. See, *e. g.,* United States Post Office Dept., Restrictions on Transportation of Letters 16–17 (4th ed. 1952). When it issued formal regulations, the Postal Service included the requirement that the letters be the carrier's own:

> "The sending or carrying of letters is permissible if they are sent by or addressed to the person carrying them. If the individual actually carrying the letters is

not the person sending the letters or to whom the letters are addressed, then such individual must be an officer or employee of such person (see [39 CFR] § 310.3(b)(2)) and the letters must relate to the current business of such person." 39 CFR § 310.3(b) (1987).

The Postal Service's regulations also read "compensation" for purposes of the private-hands exception in a way consistent with our evaluation of the term. They describe the exception's scope as follows:

"The sending or carrying of letters without compensation is permitted. Compensation generally consists of a monetary payment for services rendered. Compensation may also consist, however, of non-monetary valuable consideration and of good will. Thus, for example, when a business relationship exists or is sought between the carrier and its user, carriage by the carrier of the user's letter will ordinarily not fall under this exception." § 310.3(c).

Appellant and the United States have urged us to defer to these agency constructions of the statute. While they reach a different conclusion as to the proper application, appellees specifically indicated at oral argument that they were not challenging the validity of the regulations. Tr. of Oral Arg. 33. Because we have been able to ascertain Congress' clear intent based on our analysis of the statutes and their legislative history, we need not address the issue of deference to the agency.

## III

The California Court of Appeal incorrectly concluded that the carriage of letters involved in this case was within an exception to the Private Express Statutes. Properly construed, neither of the statutory exceptions proffered by appellees—the letters-of-the-carrier exception and the private-hands exception—permits appellant to carry the Union's

letters in its internal mail system.   Accordingly, the judgment of the California Court of Appeal is

*Reversed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.·

JUSTICE WHITE, concurring in the judgment.

The issue here is the proper interpretation of the letters-of-the-carrier and the private mail exceptions to the Private Express Statutes.   In reaching a decision we must deal with the Postal Service regulations construing these exceptions; for those regulations, which the majority sets out in its Part II–C, must be respected unless they are inconsistent with the statute—unless either or both are clearly foreclosed by the language or legislative history of the governing statute.   If Congress has expressly spoken on the precise issue at hand, the agency must of course not stray from that legislative intent in enforcing the statute.   *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984).   But if there is more than one rational construction of the statute, the agency's view should normally be respected.

Here, as I see it, the language of neither exception settles the matter.   That should end the inquiry unless the legislative history clearly negates the agency's view expressed in the regulations.   Where the statute itself is not determinative and is open to more than one construction, the legislative history must be quite clear if it is to foreclose the agency's construction as expressed in its regulations, which is surely not the case here.

Inquiry into that history may lead a court to conclude that the agency's interpretation is not only permissible but is also the only acceptable construction of the law.   But even on the majority's own description of the statutory background, I am unable to conclude that the agency could not have adopted, and could not now adopt, a view of the exceptions that would,

on the facts of this case, have reflected the views urged by appellees, particularly with respect to the private mail exception.

Accordingly, I concur in the judgment.

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

It is clear to me that the university's compliance with the state-law requirement that it allow the Union free use of its internal mail system to send unstamped letters to its employees would constitute delivery "by private hands without compensation" within the meaning of 18 U. S. C. § 1696(c). I therefore respectfully dissent.

The construction of the Private Express Statutes urged by the Government and adopted by the majority broadens the scope of the federal monopoly beyond that envisioned by the Continental Congress when it passed the first statutes defining the postal monopoly in 1782, and by Congress when it reenacted those statutes in 1792 and amended them in 1825, 1845, and 1909. This broad construction is contrary to the statutory language and hostile to the wisdom of narrowly construing the legislation that created the powerful and far-reaching postal monopoly. There are at least three important reasons to construe the Private Express Statutes narrowly. First, the statutes impose criminal penalties for their violation. Though the sanctions are modest and seldom imposed, the rule of lenity requires a strict construction of the statutes' provisions. Second, the statutes grant an economic monopoly. Even though the Federal Government is the proprietor of the monopoly, this Nation's tradition of opposition to monopolistic privileges supports a policy of strict construction. Third, and of greatest significance, expanding the monopoly beyond the bounds delimited by Congress will inevitably curtail the volume of communication that would otherwise be exchanged in a free society.

It is quite wrong to assume that a private carrier, such as a university, that allows a third party to use its internal mail

delivery system without charge is necessarily depriving the Postal Service of significant revenues. Many messages that can be sent free of charge will simply not be sent at all if the sender is required to pay a user fee in the form of postage for the privilege of communicating in this way. As JUSTICE WHITE has correctly noted, no one can question the fact that this "user fee measurably reduces the ability of various persons or organizations to communicate with others." *United States Postal Service* v. *Greenburgh Civic Assns.*, 453 U. S. 114, 141 (1981) (concurring in judgment). The facts of the *Greenburgh* case demonstrate that there are many worthwhile civic groups whose ability to communicate with their constituents is seriously impaired when they must pay postage instead of using private methods of distribution. *Id.*, at 119–120. Thus, a broad prohibition against the use of free private facilities imposes a real burden on the First Amendment right to communicate which may well be more significant than the uncertain loss of revenue to the Postal Service. The "First Amendment's guarantee of free speech applies to . . . teacher's mailboxes as surely as it does elsewhere." *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 44 (1983).

I

The monopoly granted by Congress to the Postal Service is limited to the right to deliver mail for "hire, reward, or other profit or advantage." The delivery of mail without compensation does not infringe this monopolistic grant, and the statutes creating the monopoly have always permitted the private delivery of mail without profit. The first statute granting monopoly privileges to the Postal Service was enacted by the Continental Congress in 1782. It provided:

> "[T]he Postmaster General of these United States for the time being, and his deputy and deputies, thereunto by him sufficiently authorised, and his and their agents, post-riders, expresses and messengers respectively, and no other person whatsoever, shall have the receiving,

taking up, ordering, despatching, sending post or with speed, carrying and delivering of any letters, packets or other despatches from any place within these United States *for hire, reward, or other profit or advantage . . . .*" Act of Oct. 18, 1782, 23 J. Continental Cong. 670, 672–673 (G. Hunt ed. 1914). (Emphasis added.)

When Congress reenacted the substance of this statute in 1792, Act of Feb. 20, 1792, ch. 7, § 14, 1 Stat. 236, the language it chose again made clear that the monopoly being granted was limited to the right to deliver mail for profit:

"That if any person, other than the Postmaster General, or his deputies, or persons by them employed, shall take up, receive, order, dispatch, convey, carry or deliver any letter or letters, packet or packets, other than newspapers, *for hire or reward,* or shall be concerned in setting up any foot or horse post, wagon or other carriage, by or in which any letter or packet shall be carried *for hire,* on any established post-road, or any packet, or other vessel or boat, or any conveyance whatever, whereby the revenue of the general post-office may be injured, every person, so offending, shall forfeit, for every such offence, the sum of two hundred dollars." *Ibid.* (Emphasis added.)

In 1825 Congress repealed all previous postal statutes in favor of a new postal law. Act of Mar. 3, 1825, ch. 64, 4 Stat. 102. The new statutes continued the monopoly, but substantially weakened the prohibitions against the private carriage of mail. See *id.,* §§ 6, 17, 19, 4 Stat. 104, 106, 107; *United States* v. *Kimball,* 26 F. Cas. 782 (No. 15,531) (DC Mass. 1844) (holding that 1825 statutes as amended, Act of Mar. 2, 1827, ch. 61, § 3, 4 Stat. 238, did not prohibit the carriage of letters for profit by railroad); Craig & Alvis, The Postal Monopoly: Two Hundred Years of Covering Commercial as Well as Personal Messages, 12 U. S. F. L. Rev. 57, 72 (1977). This weakening encouraged the proliferation of private express

companies. In 1845 Congress responded by enacting new legislation "to reduce the rates of postage, to limit the use and correct the abuse of the franking privilege, and for the prevention of frauds on the revenues of the Post Office Department." Act of Mar. 3, 1845, ch. 43, 5 Stat. 732. The 1845 Act was intended to protect the Postal Service from competition, but, at the same time, Congress saw fit to continue to allow the private delivery of mail without charge.· Accordingly, the 1845 statute emphasized the distinction between the private delivery of mail for profit—which was prohibited—and private delivery when there was "no compensation being tendered or received therefor in any way"—which was not. *Id.*, at 736.

The Private Express Statutes as they are codified today are not substantially different from those enacted in 1845. Title 18 U. S. C. § 1696(c) provides: "This chapter shall not prohibit the conveyance or transmission of letters or packets by private hands without compensation." The history of this provision makes clear that although articulated as an exception, the exemption for mail delivered by "private hands"[1] without compensation really reflects not merely a desire to excuse certain conduct from criminal sanction but rather an intention to continue to limit the scope of the monopoly granted the Postal Service to the delivery of mail for compensation. The monopoly Congress granted the Postal Service was simply never intended to reach so far as to encompass the delivery of mail by private parties without compensation.

It seems doubtful that Congress envisioned when it created the postal monopoly the development of internal mail

---

[1] I agree with the majority that the carriage of mail by the university (governed by appellant Regents and hereafter referred to as appellant) would be carriage by "private hands" within the meaning of the statute. As Attorney General Harmon commented in an opinion on the scope of the postal monopoly written in 1896, the term "'private hands' was evidently intended to cover all except common carriers on post routes." 21 Op. Atty. Gen. 394, 401 (1896).

systems, such as those that are now found in large universities or large apartment complexes, and much more doubtful that it intended to impose a burden on the free flow of communication within such places. Since the attention of Congress was focused on the actions of common carriers who were being paid to deliver federal mail and on competing private enterprises that were imposing charges similar to post-age for their services, I cannot believe Congress intended to interfere in any way with not-for-profit civic organizations such as schools or universities in their provision of uncompensated delivery services or with any other delivery of mail without anticipation of "reward or other profit or advantage." Act of Oct. 18, 1782, 23 J. Continental Cong., at 672–673.

This interpretation of the scope of the monopoly authorized by the Private Express Statutes is confirmed by the fact that prior to 1979 the applicable postal regulation unambiguously permitted "the sending or carrying of letters . . . if no charge for carriage [was] made by the carrier." 39 CFR § 310.3(c) (1979).[2] Under the plain language of this regulation it would have been difficult to argue that appellant could not make its internal mail delivery system available to the Union without infringing on the legitimate scope of the federal postal monopoly. In 1979, however, the Service amended the regulation because it thought the regulation suggested too narrow a construction of the word "compensation." The regulation was amended to make clear that compensation could "consist . . . of non-monetary valuable consideration and of good will." 39 CFR § 310.3(c) (1987). Although this "clarification" was not intended to change the law, see 43 Fed. Reg.

---

[2] The full text of the regulation provided:

"(c) *Private hands without compensation.* The sending or carrying of letters is permissible if no charge for carriage is made by the carrier. However, a person engaged in the transportation of goods or persons for hire does not fall within the exception merely by carrying letters free of charge for customers whom he does charge for the carriage of goods or persons."

60615, 60618 (1978); Advisory Op., PES 76–4 Reconsidered (Jan. 15, 1982), in this case the Service seeks to parlay the "clarification" into an unprecedented expansion of the postal monopoly.

## II

Even as "clarified" the Private Express Statutes and the regulation interpreting the private-hands exception do not support the conclusion that appellant would violate the postal monopoly if it delivered mail to its employees on behalf of the Union.  Appellant's delivery of the mail could only violate the postal monopoly if it were somehow compensated for its delivery.  The argument that appellant's carriage of letters under the compulsion of state law would generate "compensation" of its own force merely because appellant has a business relationship with the sender and the recipients of the mail must be rejected as contrary to the express language of the Private Express Statutes and to the historical contours of the monopoly given the Postal Service.

Compensation may take many forms; it is not necessarily monetary.  It may, as the Postal Service expressed in its Advisory Opinion when appellant asked whether its delivery of the Union's letters would violate the Private Express Statutes, include such intangibles as "good will," "forbearance of demands for benefits," or the "facilitation of a continuing relationship."  Advisory Op., PES No. 82–9 (July 2, 1982), App. to Juris. Statement A66, A71.  But these intangibles may be recognized as compensation only if they have value to the recipient.  Recognition that compensation may take an intangible form does not diminish the requirement that the recipient receive something of value in exchange for the costs it incurs when it undertakes the carriage, that is, that it receive some benefit on account of the carriage.  Appellant's delivery of the Union's letters would fall squarely within the private-hands exception unless some benefit would flow directly to it as a result of its carriage of letters for the Union.

I have been unable to identify any benefit that appellant will acquire if it begins to fulfill its obligation under state law to allow the Union to use its mail system. The state statute that creates the obligation does not mandate, or even appear to contemplate, that appellant will receive compensation for complying with this duty.[3] Further, it has not been suggested that the Union intends nonetheless to provide some compensation to appellant. Thus the question becomes whether despite the absence of any requirement that the Union compensate appellant and the lack of any intention on the part of the Union to compensate appellant, some intangible compensation will necessarily flow from the Union or some other source when appellant begins to fulfill its state-law obligations.

There is no reason to suspect that appellant will benefit from any increased good will towards it on the part of the Union. Although such good will might conceivably be generated if appellant were to provide the service out of the kindness of its heart, no good will, at least no good will that qualifies as compensation, can be thought to arise merely because an entity does precisely what state law compels it to do. No business can establish good will—"'[s]omething in business which gives reasonable expectancy of preference in race . . . of competition'"[4]—merely by broadcasting that it, as all businesses are expected to do, conducts itself in conformance with applicable state law. Similarly, there is no reason to anticipate that appellant will enjoy any forbearance of de-

---

[3] The Higher Education Employer-Employee Relations Act (HEERA), Cal. Govt. Code Ann. § 3568 (West 1980), provides:

"Subject to reasonable regulations, employee organizations shall have the right of access at reasonable times to areas in which employees work, the right to use institutional bulletin boards, mailboxes and other means of communication, and the right to use institutional facilities at reasonable times for the purpose of meetings concerned with the exercise of the rights guaranteed by this act."

[4] Black's Law Dictionary 625 (5th ed. 1979) (quoting *In re Witkind's Estate*, 167 Misc. 885, 895, 4 N. Y. S. 2d 933, 947 (1938)).

mands for benefits by the Union. First, the Union is not the collective-bargaining agent of appellant's employees. Second, and more importantly, it is unreasonable to assume that the Union will refrain from seeking some demand because appellant does what state law compels it to do. Nor could appellant reasonably be expected to be able to utilize its compliance with state law as a bargaining chip in disputes with the Union. Appellant has a pre-existing duty to conduct itself in accordance with the law, and it is unreasonable to think that the Union would give appellant anything in return for a promise to continue to obey the law.

I also do not find in the record any evidence that a benefit will flow from appellant's employees to it on account of its delivery to them of mail from the Union. Appellant's employees are currently obligated to provide their services to appellant without regard to whether appellant complies with its state-law obligation to allow the Union access to its mail system. Appellant's compliance will not increase its employees' obligations to it one whit.

Appellant contends that the Postal Service "has consistently taken the position that any business relationship between the carrier and the sender or recipient defeats the gratuitous character of the carriage." Brief for Appellant 35. In fact the Postal Service's concept that compensation is implicit in any business relationship was adopted for the first time in this case.[5] As the Postal Service admitted in its Ad-

---

[5] The regulation implementing the private-hands-without-compensation exception discusses the impact of a business relationship on the "without compensation" analysis:

"Compensation may also consist, however, of non-monetary valuable consideration and of good will. Thus, for example, when a business relationship exists or is sought between the carrier and its user, carriage by the carrier of the user's letter will ordinarily not fall under this exception." 39 CFR § 310.3(c) (1987).

Thus the regulation recognizes that in most instances the existence of a business relationship will suggest such an exchange of value for any services performed by one party for another that the private-hands-without-

visory Opinion, this case is distinguishable from those previously considered by the Postal Service in that the Union involved is not the collective-bargaining agent of the carrier and the carriage would not be voluntarily undertaken. Advisory Op., PES No. 82–9 (July 2, 1982), App. to Juris. Statement A66. It is one thing to recognize, as the Postal Service has previously, that in a business setting voluntary gratuitous acts often benefit the actor in a concrete way and quite another to conclude that merely because a business relationship exists between the parties any action, even though compelled by state law, that benefits the other party generates compensation.

The only previous judicial interpretation of the private-hands-without-compensation exception, *United States* v. *Thompson*, 28 F. Cas. 97 (No. 16, 489) (DC Mass. 1846), provides no support for the concept of "implicit-in-the-relationship compensation" relied on here by appellant and by the majority. In *Thompson* the District Court held that the exception did not permit a private carrier of merchandise to carry letters "in connection with, or as part of his business of a merchandise express, although no charge was made for letters as such." *Id.*, at 98. The court recognized that the mere fact that defendant did not charge a fee for the delivery of letters "as such" did not mean that he was not compensated for the delivery. Indeed, the fact of compensation was obvious from the fact that defendant delivered letters only on behalf of persons who hired him to deliver merchandise. The court's rejection of defendant's argument that his delivery of letters

compensation exception will not apply. The use of the word "ordinarily," however, makes clear that the regulation anticipates that there will be occasions when carriage of mail will be "without compensation" even if there is a business relationship between the carrier and the user. The position taken by the Postal Service and the majority of this Court in this case, however, admits of no such possibility. In their view, once a business relationship is established, the applicability of the exception is foreclosed. This view is contrary to the plain language of the exception, to previous applications of the exception, and to the regulation.

fell within the private-hands exception because he did not charge a distinct fee for the delivery of letters did not rest on the mere existence of a business relationship between the merchandise carrier and the parties on whose behalf he delivered the letters, but rather on the recognition that the provision of that service enhanced the profitability of the merchant's business. This increase in profitability provided compensation to the merchant for the carriage service.[6]

The instant case is clearly distinguishable from *Thompson* and from the other factual settings in which the Postal Service or the Attorney General has considered the scope of the exception.[7] The very fact that the majority and the Postal

[6] The drafters of 39 CFR § 310.3(c) (1987) no doubt had *Thompson* in mind when they specified in the regulation that "a person engaged in the transportation of goods or persons for hire does not fall within the exception merely by carrying letters free of charge for customers whom he does charge for the carriage of goods or persons."

[7] The opinions of the Attorney General and Postal Service relied on by appellant do not support its assertion that the private-hands exception has consistently been interpreted as not authorizing the delivery of mail if a business relationship exists between the carrier and the sender or the recipient. In 1896 the Attorney General was asked whether it was "proper for a railroad company to carry, outside of the mails, not in Government stamped envelopes, first-class mail matter intended for a connecting line." 21 Op. Atty. Gen., at 397. In explaining that such conduct would violate the Private Express Statutes, the Attorney General opined that the "express or implied obligation" between railroad lines to carry mail for each other was compensation within the meaning of the private-hands exception. *Id.*, at 401. The Attorney General did not express the view that compensation was implicit in the business relationship between the railroad lines but rather found that the exchange of reciprocal obligations was compensation.

In Advisory Opinions PES 76-4 (Mar. 3, 1976) and 76-4 Reconsidered (Jan. 15, 1982), the Postal Service expressed the view that the delivery of mail by the Salem Oregon School District on behalf of the collective-bargaining agent of its employees would not come within the private-hands-without-compensation exception. The School District was providing the service because it had agreed to do so in a collective-bargaining agreement. Since the agreement to perform the service had been reached as part of a bargaining process, it was clear that the District had re-

Service find it necessary to articulate the broad rule that compensation arises solely from the existence of a business relationship between the carrier and the recipient or sender in order to take this case out of the exception proves that this case represents an attempt to expand the scope of the Postal Service monopoly by narrowing the reach of the exception.

The policies behind the Private Express Statutes would not be impaired by recognizing that this case falls within the private-hands exception. The enactment of the private-hands exception itself reflects a decision to forgo whatever revenues might be generated by expanding the scope of the postal monopoly to encompass all deliveries of written messages by private parties. Moreover, the legislative history of the statute does not support the majority's position that the exception for carriage by private hands without compensation was designed "solely to permit 'an innocent man . . . to do a favor to some[one].'" *Ante*, at 599. As discussed *supra*, at 605–608, the concept that the monopoly given the Postal Service did not encompass the delivery of mail by private parties without compensation had its origin with the birth of the monopoly. Nothing in the legislative history of the statutes creating the monopoly explains why the Continental Congress and later Congress decided to so limit the scope of the monopoly.[8] The language that the majority seeks to

---

ceived something of value in exchange for its agreement to provide the service. The controlling element of the Postal Service's opinion was not the overall business relationship between the Union and the School District but the fact that the provision of the service was a negotiated element of a collective-bargaining agreement.

There is no suggestion in the instant case that appellant will receive a *quid pro quo* if it undertakes the delivery of the Union's mail or that it will be able to acquire some benefit for the service through bargaining. The reality here is that appellant will get exactly nothing for its delivery of the Union's mail save the satisfaction of finding itself in compliance with a compulsion under state law.

[8] The only time the private-hands-without-compensation exception is referenced in the legislative history of the Private Express Statutes is in a

rely on is actually an excerpt from a debate concerning a proposed, but never passed, amendment to 18 U. S. C. § 1694, which now contains the letters-of-the-carrier exception.

During the Senate's debate on how to amend § 1694 to insure that railroads could carry their own urgent letters without violating the Private Express Statutes, Senator McLaurin and Senator Teller proposed that the words "for hire" or "for compensation" be added to the statute, so that the statute would allow common carriers to carry mail provided that they did not do so "for hire." 42 Cong. Rec. 1902, 1903 (1908). Senator McLaurin spoke in favor of the amendment saying,

> "[M]y greatest objection to this provision is that some stage driver who happens to be making regular trips would, if he were, out of the kindness of his heart, to take a letter for some friend and deliver it to another friend on the way, be liable to pay a fine of $50. . . . I think, therefore, that the amendment offered . . . would accomplish a great deal of good. It will make clear the construction that was given to it by Attorney-General Harmon, and it will not be necessary to construe this section.
>
> .  .  .  .  .
>
> "My idea about it is, though, that there ought to be some provision whereby an innocent man, probably one in an humble position and following an humble pursuit, would not stumble into a pitfall when, out of the goodness of his heart, he was trying to do a favor to some friend of his or to somebody, whether he was a friend or not." *Id.*, at 1905.

In further debate the following day, the amendment was rejected in favor of the amendment proposed by Senator Suth-

descriptive comment in a House Report on the 1845 Act: "Penalties are provided . . . with exceptions in favor of the party . . . who conveys the letter out of neighborly kindness, without fee or reward." H. R. Rep. No. 477, 28th Cong., 1st Sess., 4 (1844).

erland, which we now know as the letters-of-the-carrier exception. *Id.*, at 1976. A brief colloquy over 60 years after the passage of the 1845 Act about a proposed-but-never-adopted amendment is a slender reed on which to base the Court's wholly unnecessary and unwise interpretation of this ancient monopoly.

I respectfully dissent.