Alfredo DeVARGAS,
Plaintiff–Appellant,

v.

MASON & HANGER–SILAS MASON CO., INC.; T.R. Hook, individually and in his official capacity; Don Hardwick, individually and in his official capacity; John Does, One through Three, individually and in their official capacities; Los Alamos National Laboratory; Gary Granere, Acting Area Manager–Department of Energy Los Alamos Area Office; Regents of University of California; Donald Kerr, Director, Los Alamos National Laboratory; The United States Department of Energy; Robert Pogna, Employee Los Alamos National Laboratory; Ed C. Walterscheid, Employee Los Alamos National Laboratory; Donald Paul Hodel, Secretary of Department of Energy; and Richard Roes, One through Two, Individually and in their official capacities; and John S. Herrington, Defendants–Appellees.

No. 89–2061.

United States Court of Appeals,
Tenth Circuit.

Aug. 9, 1990.

Richard Rosenstock (Steven Farber, Santa Fe, N.M., and Philip Davis, Legal Director, New Mexico Civ. Liberties Union, Albuquerque, N.M., of counsel, with him on the briefs), Chama, N.M., for plaintiff-appellant.

Michael E. Robinson (Stuart E. Schiffer, Acting Asst. Atty. Gen., William L. Lutz, U.S. Atty., and John F. Cordes, with him on the brief), Appellate Staff Civ. Div., Dept. of Justice, Washington, D.C., for federal defendants-appellees.

Joseph E. Earnest (Laurie A. Vogel, of Cherpelis, Vogel & Salazar, of Albuquerque, N.M., with him on the brief), Montgomery & Andrews, P.A., Santa Fe, New Mexico, for defendants-appellees the University and Mason & Hanger.

Before TACHA and McWilliams, Circuit Judges, and CHRISTENSEN, District Judge.*

TACHA, Circuit Judge.

This civil rights action arises from the refusal of Mason & Hanger–Silas Mason Company, Inc. ("Mason & Hanger") to consider Alfredo DeVargas for a position as a security inspector at the Los Alamos National Laboratory ("LANL") in Los Alamos, New Mexico. The district court granted the defendants' motion for summary judgment, and DeVargas appeals. We affirm.

I.

DeVargas applied for a security inspector position with Mason & Hanger in 1981 and 1983. Pursuant to a contract with the Regents of the University of California ("Regents"), Mason & Hanger supplies security inspectors for LANL. The Regents

---

* The Honorable A. Sherman Christensen, District Judge, United States District Court for the District of Utah, sitting by designation.

operate LANL for the Department of Energy ("DOE"), which conducts nuclear weapon and energy research at LANL. The three individual LANL defendants, Donald Kerr, Robert Pogna, and Edward C. Walterscheid ("individual LANL defendants") are employees of the University of California ("University"). Gary Granere, the Acting Area Manager for the DOE's LANL office, is a federal employee.

In 1981, Mason & Hanger and its employees, T.R. Hook and Don Hardwick ("individual Mason & Hanger defendants"), refused to process DeVargas's employment application, relying on a then-applicable DOE regulation, Interim Management Directive No. 6102 § A.6.b.(8) Appendix IV (IMD 6102),[1] which provided that "[a] one-eyed individual shall be medically disqualified for security inspector duties." DeVargas has vision in only one eye. When DeVargas reapplied in 1983, the Mason & Hanger defendants consulted with the individual LANL defendants, who agreed that IMD 6102 constituted a mandatory disqualification of one-eyed persons.

DeVargas filed suit, alleging in his first amended complaint that the defendants violated sections 504 and 505 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794–94a, and that the defendants unlawfully discriminated against him on the basis of his ancestry and handicap, in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the fifth and fourteenth amendments, U.S. Const. amends. V, XIV. DeVargas also alleged that the DOE promulgated IMD 6102 in violation of section 504 and the fifth amendment.

On April 9, 1986, the district court granted the defendants' motion for summary judgment on the section 504 and fifth amendment claims. The court dismissed all claims against the Regents and LANL based on their eleventh amendment immunity.[2] The court did not extend eleventh amendment immunity to Kerr, Pogna, and Walterscheid, the LANL defendants, because they were sued only in their individual capacity. The DOE, Secretary of Energy Donald Paul Hodel, and Gary Granere moved to dismiss all claims for monetary damages based on the defense of sovereign immunity. The court permitted only DeVargas's claims for injunctive, nonmonetary relief to continue against these defendants in their official capacities.[3] *See* 5 U.S.C. § 702. The court did not dismiss the claims for monetary damages against Hodel and Granere in their individual capacities.

The defendants also raised the defense of qualified immunity against DeVargas's claim that they unlawfully discriminated against him on the basis of his ancestry and handicap in violation of 42 U.S.C. section 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In October, 1986, the district court ruled that the individual LANL and DOE defendants enjoyed qualified immunity from DeVargas's claims for damages against them in their individual capacities. The court rejected the request of the Mason & Hanger defendants for qualified immunity. Pursuant to an interlocutory appeal, this court reversed, ruling that Mason & Hanger and the individual Mason & Hanger defendants also possess

1. In November 1984, IMD 6102 was superseded by new regulations, which are codified at 10 C.F.R. § 1046 (1989). DeVargas has not reapplied for employment following the promulgation of these new regulations. For this reason the district court ruled that DeVargas lacks article III standing to argue that he is entitled to be hired by the defendants. DeVargas does not appeal this ruling.

2. Congress subsequently abrogated any Eleventh Amendment defenses to a section 504 claim that is based on conduct occurring after October 21, 1986. *See* 42 U.S.C. § 2000d–7.

3. We note that the district court's ruling was not entirely correct. While the district court barred all claims for monetary relief, the bar on recovery of "money damages" contained in 5 U.S.C. section 702 does not include equitable backpay, which is a form of equitable relief, not monetary damages. *See Bowen v. Massachusetts*, 487 U.S. 879, 891–912, 108 S.Ct. 2722, 2731–41, 101 L.Ed.2d 749 (1988). DeVargas, however, does not appeal the district court's ruling on this issue.

qualified immunity in spite of Mason & Hanger's status as a private corporation. *See DeVargas v. Mason & Hanger–Silas Mason Co., Inc.*, 844 F.2d 714 (10th Cir. 1988) (*DeVargas I*). We also held that the conduct of the Mason & Hanger defendants did not violate clearly established law under either IMD 6102 or the equal protection clause of the fourteenth amendment.[4] *Id.* at 724–25. Following remand, the district court permitted DeVargas to file a second amended complaint. The court entered summary judgment against DeVargas's remaining claims on December 14, 1988.

DeVargas limits his appeal to the following arguments: (1) the defendants violated section 504; (2) the trial court erred by refusing to permit further discovery prior to ruling on the section 504 claim; (3) the defendants' application of IMD 6102 deprived DeVargas of his clearly established right to substantive due process of law under the fifth and fourteenth amendments; and (4) the defendants violated 42 U.S.C. section 1983.

## II.

We first determine whether the Mason & Hanger defendants violated section 504, which prohibits discrimination against handicapped persons by "any program or activity receiving federal financial assistance." 29 U.S.C. § 794. The district court granted summary judgment in favor of Mason & Hanger, concluding that liability could not lie against the Mason & Hanger defendants because Mason & Hanger's operations were not programs or activities that received federal financial assistance. DeVargas insists that the available evidence indicates that Mason & Hanger received federal financial assistance.

In our review of grants of summary judgment, we must reverse if there is a genuine issue concerning a material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We review all legal questions

de novo. *See Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir.1987).

The term "financial assistance" is not defined in the Rehabilitation Act. We apply the ordinary meaning of the term and conclude that an entity receives financial assistance when it receives a subsidy. *See Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1208–09 (9th Cir.1984), *cert. dismissed*, 471 U.S. 1062, 105 S.Ct. 2129, 85 L.Ed.2d 493 (1985).

In determining whether a party has obtained federal financial assistance under section 504, we decline to scrutinize the fair market value of every transaction as if we were article III accountants. *See id.* at 1210 (outlining practical problems of a test based solely on fair market value). We do not read section 504 to declare that a contractor receives federal financial assistance whenever the contractor negotiates a contract with favorable terms that compensate the contractor at a rate above the fair market value. We agree with the *Jacobson* court's conclusion that "in determining which programs are subject to the civil rights laws, courts should focus not on market value but on *the intention of the government*" to give a subsidy, as opposed to government intent to provide compensation. *Id.* at 1210 (emphasis added). We conclude that to determine the applicability of section 504, we must determine whether the government intended to give Mason & Hanger a subsidy.

In this case there is little doubt that Congress did not intend to subsidize Mason & Hanger's operations. Prior to the decision to replace the former government guards with private employees, the DOE conducted a study which concluded that the government would save approximately $3.5 million by contracting out guard services. Moreover, the government awarded the contract to Mason & Hanger only after a competitive bidding process. Both of these factors lead us to conclude that there was

---

**4.** None of the defendants in this case argue on appeal that they are entitled to a qualified im-
munity defense from the section 504 claim.

no governmental intent to give Mason & Hanger a subsidy.

Our conclusion is consistent with departmental regulations. The Department of Energy's implementing regulations state that the provisions of the Rehabilitation Act do not apply to government procurement contracts, see 10 C.F.R. § 1040.2(b)(3) (1985), which are defined as, inter alia, contracts to purchase services from nonfederal sources, see 41 C.F.R. § 1–1.209 (1984) (former provision). Under this regulation, the purchase from Mason & Hanger of nonpersonal services is a procurement contract outside the reach of the Rehabilitation Act.[5] We hold that the district court correctly granted the motion for summary judgment by the Mason & Hanger defendants on the grounds that the security company and its employees do not fall within the ambit of section 504 of the Rehabilitation Act.

### III.

■ We next determine whether the district court correctly granted the individual LANL defendants' request for summary judgment on the section 504 claim.[6] DeVargas argues that the individual LANL defendants are liable under section 504 because LANL, an alleged recipient of federal financial assistance, required Mason & Hanger to administer the allegedly discriminatory policy. The contract between the Regents and Mason & Hanger expressly required that Mason & Hanger abide by any applicable federal regulations relating to the security of LANL. One of the applicable regulations was IMD 6102, and DeVargas states that in 1983 the individual LANL defendants informed Mason & Hanger that IMD 6102 mandated that Mason & Hanger not hire DeVargas. DeVargas insists that the individual LANL defendants cannot escape liability for discrimination when they required Mason & Hanger to administer the allegedly discriminatory policy.

The district court rejected DeVargas's argument on the grounds that section 504's ban on "discrimination under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794, was program-specific. Thus, the district court ruled that even if LANL did receive federal financial assistance, the actions of the LANL defendants did not violate section 504 because the particular program that allegedly discriminated against DeVargas was Mason & Hanger, not LANL.

■ At the time that the district court issued its ruling on DeVargas's 504 claim, the court correctly relied on *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), which held that section 504's prohibition on discrimination by a "program or activity receiving Federal financial assistance" extended only to the specific program or activity receiving the federal funds. *Id.* at 635–36, 104 S.Ct. at 1255. The *Consolidated Rail* decision relied on *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), which held that Title IX's ban on sex discrimination in any "program or activity receiving Federal financial assistance" prohibited discrimination only in the particular program or activity specifically supported by federal funds. *Id.* at 570–76, 104 S.Ct. at 1219–23. On the basis of these decisions, the district court correctly held that section 504 was program-specific. *See Niehaus v. Kansas Bar Ass'n*, 793 F.2d 1159, 1162–63 (10th Cir. 1986) (section 504 contains a program specificity requirement); *Gallagher v. Pontiac*

---

5. The DOE regulation is in accord with those of other executive agencies. For example, the regulations of the Department of Health and Human Services state that government procurement contracts do not convey financial assistance, while transfers or leases of government property at less than fair market value or for reduced consideration are forms of financial assistance. *See* 45 C.F.R. § 84.3(h) (1989). *See also* 28 C.F.R. § 41.3(e) (1989) (Department of Justice regulation).

6. At the outset we note that the individual LANL defendants are now before us only in their individual, as opposed to their official, capacities. Therefore DeVargas cannot obtain equitable backpay from the LANL defendants because government officials acting in their individual capacities cannot perform the official function of awarding backpay. *See Lenea v. Lane*, 882 F.2d 1171, 1178 (7th Cir.1989).

*School Dist.*, 807 F.2d 75, 79–81 (6th Cir. 1986) (holding that under program-specific requirement of section 504, plaintiff must show that he was denied the benefits of a scholastic program receiving federal financial assistance and not just that he was denied the benefits of a program operated by a school system receiving federal financial assistance).

After the district court issued its opinion, however, Congress enacted the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 Stat. 28 (1988) ("Restoration Act" or "Act"). Congress premised the Restoration Act upon its findings that (1) "certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of Title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title VI of the Civil Rights Act of 1964; and (2) legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered." Restoration Act § 2, 102 Stat. at 28. The Senate report more bluntly states that the purpose of the Restoration Act is "to overturn the Supreme Court's 1984 decision in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211...." S.Rep. No. 64, 100th Cong., 2d Sess. 1, *reprinted in* 1988 U.S. Code Cong. & Admin.News 3–4.

Section four of the Restoration Act added section 504(b) to the Rehabilitation Act, which provides in pertinent part: "For purposes of this section, the term 'program or activity' means *all of the operations* of— ... (2)(A) a college, university or other postsecondary institution...." Restoration Act § 4, 102 Stat. at 29 (emphasis added) (codified at 29 U.S.C. § 794(b)). This language overturns the program-specific interpretation of "program or activity" developed in *Grove City* and *Consolidated Rail*. In the context of a university, the term "program or activity" now refers to all of the operations of the university.

DeVargas argues that the passage of the Restoration Act invalidates the district court's reliance on the program-specific interpretation of section 504 that existed prior or to enactment of the Restoration Act. DeVargas renews his argument that the individual LANL defendants cannot escape liability under section 504 of the Rehabilitation Act when they required Mason & Hanger to perpetrate discrimination.

### A.

It is clear that the individual LANL defendants are not liable under section 504 as interpreted by the Supreme Court in *Consolidated Rail* prior to the Restoration Act. Therefore, we must decide whether the Restoration Act retroactively applies to this case.

To determine whether the Restoration Act applies retroactively, we look to congressional intent. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno*, —— U.S. ——, ——, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990) ("where the congressional intent is clear, it governs"). Our examination of the language and legislative history of the Restoration Act reveals an absence of clear congressional intent that courts retroactively apply the Act's amendments.

We look first to the language of the Restoration Act. *See Kaiser*, 110 S.Ct. at 1575. The Act states:

The Congress finds that—

(1) certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of ... section 504 of the Rehabilitation Act of 1973 ...; and

(2) legislative action is necessary to *restore* the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered.

*See* Restoration Act § 2, 102 Stat. at 28 (1988) (emphasis added). The Senate report accompanying the proposed legislation echoes these sentiments:

### II. Purpose

S. 557 was introduced on February 19, 1987, to overturn the Supreme Court's

1984 decision in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, and to restore the effectiveness and vitality of the four major civil rights statutes that prohibit discrimination in federally assisted programs.

The *Grove City* ruling severely narrows the application of coverage of Title IX of the Education Amendments of 1972, Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975.

The purpose of the Civil Rights Restoration Act of 1987 is to reaffirm pre-*Grove City College* judicial and executive branch interpretations and enforcement practices which provided for broad coverage of the anti-discrimination provisions of these civil rights statutes.

S.Rep. No. 64, 100th Cong., 2d Sess. 2, *reprinted in* 1988 U.S.Code Cong. & Admin.News 3, 3–4 (footnote omitted; emphasis added). The Senate report also states that: "other cases that were in the formal enforcement stage are still in jeopardy. These are cases where discrimination has been found, voluntary compliance was refused, and recipients are using the Supreme Court's decision [in *Grove City College* ] as a defense against federal enforcement." S.Rep. No. 64, 100th Cong., 2d Sess. 11, *reprinted in* 1988 U.S.Code Cong. & Admin. News 13.

■ Considering both the language of the Restoration Act and the Senate report, we find a congressional purpose to overturn *Grove City College*, but no clear ex-

pression of intent regarding retroactive application of the Act's amendments. Unlike other congressional amendments to existing laws enacted by Congress in response to Supreme Court decisions, the Restoration Act contains no statutory language clearly stating that the Act's amendments shall or shall not apply to pending litigation.[7] We also find that the expressed congressional intent in the Senate report to "restore" section 504 to its pre-*Grove City College* interpretation reflects unambiguously only Congress's purpose to reverse the Supreme Court's program-specific reading of federal prohibitions on discrimination by programs or activities receiving federal financial assistance. Because we must find clear congressional intent to invoke retroactivity, we cannot read "restore" to mean "retroactively restore," particularly where the effect of such a reading would be to impose substantive liability for actions committed in reliance on *Grove City College* and its progeny prior to the passage of the Restoration Act in 1988. *Contra Leake v. Long Island Jewish Medical Center*, 695 F.Supp. 1414, 1416–18 (E.D.N.Y.1988) (Restoration Act applies retroactively), *aff'd*, 869 F.2d 130, 131 (2d Cir. 1989) (per curiam); *see also Bonner v. Arizona Dep't of Corrections*, 714 F.Supp. 420, 422–23 (D.Ariz.1989) (adopting reasoning of *Leake* ). Nor do we find that the Senate report's concern about potential jeopardy to formal enforcement actions due to the *Grove City College* decision necessarily requires retroactive application because there is no indication that the viola-

7. *Compare* Restoration Act *with* Longshore and Harbor Workers' Compensation Act Amendments of 1984 ("LHWCA"), Pub.L. No. 98–426, §§ 5, 28(a), 28(c), 98 Stat. 1639, 1641, 1655 (§ 5 codified as amended at 33 U.S.C. § 905; §§ 28(a), (c) discussed in legislative history notes to 33 U.S.C. § 901) *and* Handicapped Children's Protection Act of 1986 ("HCPA"), Pub.L. No. 99–372, §§ 2, 5, 100 Stat. 796, 796–97, 798 (§ 2 codified as amended at 20 U.S.C. § 1415(e)(4); § 5 discussed in legislative history notes to 20 U.S.C. § 1415). *See also* H.R.Conf. Rep. No. 1027, 98th Cong., 2d Sess. 24, *reprinted in* 1984 U.S.Code Cong. & Admin. News 2774 (§ 5 amendment of LHWCA disapproves *Washington Metro. Area Transit Auth. v. Johnson*, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984), and provides a special effective date so amend-

ment applies to pending cases, thus *WAMTA* will not have precedential effect); *Louviere v. Marathon Oil Co.*, 755 F.2d 428, 430 (5th Cir. 1985) (Congress provided that LHWCA amendment to 33 U.S.C. § 905 shall apply to pending cases); S.Rep. No. 112, 99th Cong., 2d Sess. 2–3, *reprinted in* 1986 U.S.Code Cong. & Admin. News 1799–1800 (in response to *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), § 2 of the HCPA clarifies Congress's intent that prevailing parents in Education of the Handicapped Act ("EHA") cases be awarded reasonable attorneys' fees, and HCPA also authorizes courts retroactively to award attorneys' fees for civil court actions to parents who prevailed in EHA cases pending or brought after the date of the *Smith v. Robinson* decision).

tions were not continuing. In any event, an ambiguous statement in the Senate report on the need for action does not amount to the clear intent required to invoke retroactivity. We therefore hold that the statutory language and authoritative legislative history of the Restoration Act do not evidence a clear congressional intent that courts apply retroactively the Act's amendments to section 504 of the Rehabilitation Act.

We recognize that our holding conflicts with the decisions of the Second Circuit in *Leake v. Long Island Jewish Medical Center*, 869 F.2d 130 (2d Cir.1989) (per curiam), and the Fifth Circuit in *Ayers v. Allain*, 893 F.2d 732, *reh'g en banc granted*, 898 F.2d 1014 (5th Cir.1990). After scrutinizing these opinions, however, we find their analysis unpersuasive.

The Second Circuit's opinion in *Leake* affirmed per curiam the reasoning of the district court in *Leake v. Long Island Jewish Medical Center*, 695 F.Supp. 1414 (E.D. N.Y.1988). *See Leake*, 869 F.2d at 131. We therefore focus on the district court's opinion in *Leake*.

Plaintiff Robert Leake sued his employer under section 504 of the Rehabilitation Act. The issue as framed by the district court was "whether the Restoration Act should be applied retroactively to enable plaintiff, who initiated his suit before its passage, to sue." *Leake*, 695 F.Supp. at 1416.

The *Leake* district court began its analysis by specifically finding that "the Restoration Act itself does not indicate any intent of Congress for retroactive application." *Id.* However, the court found some indication of congressional intent that courts were to retroactively apply the Restoration Act in the floor statement of the bill's sponsor, Congressman Edwards, who said "[t]his bill applies to all pending cases ...," 134 Cong.Rec. H583 (daily ed. Mar. 2, 1988), and the floor statements of Senators

Packwood [8] and Stafford.[9] *Leake*, 695 F. Supp at 1416–17. The *Leake* court then went back to the language of the Restoration Act, which it had previously found to be ambiguous on the retroactivity issue, and focused on the terms "restore" and "clarify." Analogizing to the Second Circuit's analysis of the congressional intent behind these words in *Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir.1987) (examining the Handicapped Children's Protection Act of 1986 ("HCPA")), the *Leake* district court concluded that Congress must have intended the Restoration Act to apply retroactively.

We are not persuaded by the *Leake* district court's analysis for two reasons. First, Congress's intended meaning and use of the terms "restore" and "clarify" in the HCPA is rooted in the specific context of the HCPA's statutory language and legislative history. We therefore reject the notion that congressional intent for the Restoration Act may be discerned by analogy to a different statute enacted by a different Congress.

■ Second, where the statutory language of the Restoration Act and the Senate report simply do not address retroactive application of the Act, we refuse to resolve this important issue solely on the basis of the floor statement of Congressman Edwards that the Act was to apply to pending cases. *See Brock v. Pierce County*, 476 U.S. 253, 263, 106 S.Ct. 1834, 1840, 90 L.Ed.2d 248 (1986) ("statements by individual legislators should not be given controlling effect" for purposes of discerning congressional intent); *Weinberger v. Rossi*, 456 U.S. 25, 35 n. 15, 102 S.Ct. 1510, 1517 n. 15, 71 L.Ed.2d 715 ("contemporaneous remarks of a sponsor of legislation are certainly not controlling in analyzing legislative history"). As for the floor statements of Senators Packwood and Stafford, *see supra* notes 8–9, we find that these re-

8. During the floor debate to override President Reagan's veto of the Restoration Act, Senator Packwood stated: "all we have done is change the law back to what we thought it was. We have not expanded it beyond what we thought it was." 134 Cong.Rec. § 2735 (daily ed. Mar. 22, 1988).

9. Senator Stafford, an original sponsor of section 504 of the Rehabilitation Act, stated: "[the] institution-wide definition [was] originally intended by legislators." 134 Cong.Rec. § 2739 (daily ed. Mar. 22, 1988).

marks do not directly address the retroactivity issue, much less dispose of it. Furthermore, the *Leake* district court's reliance on *Regents of the University of California v. Public Employment Relations Board*, 485 U.S. 589, 595–97, 108 S.Ct. 1404, 1409, 99 L.Ed.2d 664 (1988), for the proposition that "[c]ongressional intent may be inferred from the statement of a sponsor on the floor," *Leake*, 695 F.Supp. at 1417, is misplaced, for this rule of statutory construction only applies where the statement is consistent with the statutory language and other legislative history. *See Brock*, 476 U.S. at 263, 106 S.Ct. at 1840; *see also Regan v. Wald*, 468 U.S. 222, 236–38, 104 S.Ct. 3026, 3034–36, 82 L.Ed.2d 171 (1984) (statements of subcommittee hearings, mark up sessions, floor debates, and House and Senate reports cannot overcome plain meaning of statute). In *Regents of the University of California*, the Court primarily "rel[ied] on the normal meaning of the [statutory] language chosen by Congress," 108 S.Ct. at 1409, and then went on to discuss how this interpretation was consistent with the legislative history, including the statement of a floor sponsor, *see id.* at 1409–10. In contrast, the floor statement of Congressman Edwards speaks to an issue, retroactive application, which the *Leake* district court had already determined was not addressed in the statutory language of the Restoration Act. We refuse to rely on such a slender thread to fashion out of whole cloth a cloak of retroactivity for the Restoration Act.

We next turn to the Fifth Circuit's opinion in *Ayers v. Allain*, 893 F.2d 732 (5th Cir.1990). In *Ayers* the plaintiffs alleged that the policies and practices of various Mississippi state officials perpetuated a racially based dual system of public higher education in violation of the equal protection clause of the fourteenth amendment, U.S. Const. amend XIV, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. The district court ruled for the defendants on the issue of liability and dismissed the plaintiffs' case. The issue before the Fifth Circuit regarding the plaintiffs' Title VI claim was "whether *Grove City* controls the outcome of this case or whether the

[Restoration Act] legislation applies retroactively." *Ayers*, 893 F.2d at 754. The Fifth Circuit resolved the issue in favor of retroactivity:

Retroactive application of a statute is appropriate when Congress enacts the statute to clarify the Supreme Court's interpretation of previous legislation thereby returning the law to its previous posture. This rule flows from two of the Supreme Court's canons of statutory construction. First, subsequent legislation declaring the intent of an earlier statute is entitled to great weight.... Second, the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.

*Id.* at 754–75 (footnotes omitted).

 We disagree with the *Ayers* ruling because it resolves the retroactivity issue based on congressional intent *implied* from the circumstances motivating Congress to act rather than from the *directly relevant* statements of Congress in the statute's language or authoritative legislative history. The standard of "clear congressional intent" for the retroactive application of statutes requires articulated and clear statements on retroactivity, not inferences drawn from the general purpose of the legislation. We simply cannot derive a "clear congressional intent" solely from the circumstance that Congress acted to amend existing law in response to a Supreme Court opinion, particularly where Congress acting under the same motivating circumstances has expressly and specifically stated that its newly enacted amendment was to apply to pending cases. *See supra* note 7.

Moreover, the logic behind the Fifth Circuit's rule is inconsistent with the constitutional division of authority between Congress and the Supreme Court. Under our view of the separation of powers, it is Congress's prerogative to make the law by enacting legislation. It is, however, "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); *see also The*

*Federalist* No. 78, at 116 (A. Hamilton) (H. Commager ed. 1949) ("The interpretation of the laws is the proper and *peculiar* province of the courts.") (emphasis added). Once the Supreme Court has interpreted a statute, that construction becomes a part of the statute, and the Court's interpretation applies retroactively to pending cases. *See infra* note 11. This rule of retroactive application of judicial decisions flows directly from the Court's function of interpretating law. Stated simply, what the Court interprets the law as saying is what the law says. Congress, of course, has the power to change the law and may amend the law to comport with either its own or the (perceived) intentions of the Congress which originally enacted the law. These congressional amendments, however, cannot undo the Supreme Court's authoritative construction of the original statute. When a subsequent Congress amends the law in response to the Supreme Court's interpretation, it does not revive the original enacting Congress's interpretation of the statute which existed before the Supreme Court's interpretation. Rather, the result of a subsequent Congress's "restoration" efforts is newly created law. As with any newly enacted legislation, Congress must state clearly its intentions with regard to retroactivity. We therefore disagree with the Fifth Circuit's approach to the extent that it creates a special rule for the situation where Congress rejects a judicial interpretation; this approach implicitly treats Congress as a court of revision rather than as the law-making branch of the federal government.

 There is nothing jurisprudentially unique about the situation where Congress amends a statute in response to the Supreme Court's interpretation. Regardless of whether Congress enacts a new law or amends an existing one, our analysis remains the same. We must examine whether Congress clearly and expressly intended the new law to apply retroactively, as shown by statutory language or authoritative legislative history. We will not imply such an intent where Congress chose to remain silent. For us to "imply" intent derogates from Congress's power to determine the retroactive effect of its own laws. Therefore, in the absence of such clear congressional intent, we apply the appropriate Supreme Court precedent setting forth presumptions governing the retroactive application of newly enacted legislation.

## C.

 Having determined that the language and legislative history of the Restoration Act do not evidence a clear congressional intent for or against its retroactive application, we turn to Supreme Court precedent for guidance. Our research reveals two lines of authority setting forth conflicting presumptions regarding the retroactive application of a newly enacted federal statute where congressional intent is unclear. The court's most recent articulations of these opposing presumptions are found in *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), and *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

*Bradley* was the product of a protracted class action suit brought to desegregate the Richmond, Virginia school system. The court in *Bradley* addressed whether an appellate court should retroactively apply an attorneys' fees statute that came into effect during the pendency of the appeal. The district court had awarded attorneys' fees to the plaintiffs based on the court's general equitable powers. After the initial submission of the case to the Fourth Circuit Court of Appeals, but prior to that court's decision, Congress enacted section 718 of Title VII of the Emergency School Aid Act, 20 U.S.C. § 1617, which granted federal courts the authority to award reasonable attorneys' fees in a school desegregation case. The Fourth Circuit held that section 718 could not be applied retroactively to sustain the attorneys' fees award. The Supreme Court reversed, holding that "a court is to apply the law in effect at the time it renders its decision...." *Bradley,*

416 U.S. at 711, 94 S.Ct. at 2016.[10] The *Bradley* court read *Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), as standing for the proposition that "even where the inter[vening] law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." *Bradley*, 416 U.S. at 715, 94 S.Ct. at 2018. *Bradley* expressly rejected the contention that "a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature." *Id.*

In direct conflict with the *Bradley* presumption is another line of Supreme Court precedent, the most recent illustration of which is *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). *Bowen* examined the authority of the Secretary of Health and Human Services ("Secretary") to promulgate retroactive regulations setting limits on the level of reimbursable medicare costs. In 1981, the Secretary issued a new cost-limit schedule that contained a change in the method for calculating the "wage index," which reflects the salary levels for hospital employees in different parts of the country. The new calculation excluded federal hospital wages from the wage index. Various hospitals sued to enjoin enforcement of the 1981 cost-limit schedule. The district court struck down the 1981 wage-index rule on the ground that the Secretary had failed to provide notice and an opportunity for comment as required by the Administrative Procedure Act, 5 U.S.C. § 551. In 1984, ten months after the district court's ruling, the Secretary sought public comment on a proposal to reissue the 1981 wage index rule, retroactive to July 1, 1981. After considering the comments submitted, the Secretary reissued the 1981 cost-limit schedule and required a group of seven hospitals who had benefited from the invalidation of the 1981 schedule to return over $2 million in reimbursement payments. *See Bowen*, 109 S.Ct. at 471.

The *Bowen* Court struck down the retroactive cost-limit rules on the ground that Congress had not authorized the Secretary in the Medicare Act to issue retroactive rules. In so doing, the Supreme Court reaffirmed the rule that "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.*

The Supreme Court recently acknowledged that an "apparent tension" exists between the *Bradley* and *Bowen* lines of precedent in *Kaiser Aluminum & Chemi-*

---

**10.** To soften the potentially harsh impact of *Bradley*'s presumption favoring the retroactive application of federal statutes, the Court recognized two exceptions to the presumption that appellate courts are to apply the law in effect at the time of decision. First, the presumption does not apply where there is clear congressional intent to the contrary. *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016. Second, the presumption does not govern where retroactive application of the new law would result in "manifest injustice" to one of the parties. *Id.; see also Kaiser*, 110 S.Ct. at 1577.

*Bradley* held that courts are to determine whether manifest injustice exists by examining "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." *Bradley*, 416 U.S. at 717, 94 S.Ct. at 2019. The meaning of the *Bradley* "manifest injustice" test has been obfuscated by subsequent Supreme Court opinions, however. For example, the *Bradley* Court originally stated that the *Bradley* presumption would not be applied to "deprive a person of a right that had matured or become unconditional." *Id.* at 720, 94 S.Ct. at 2020. However, in *Bennett v. New Jersey*, 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), the Court stated that this limitation on *Bradley* "comports with another venerable rule of statutory interpretation, *i.e.*, that statutes affecting substantive rights and liabilities are presumed to have only prospective effect." *Id.* at 639, 105 S.Ct. at 1560. Thus, the *Bennett* court either declined to enter the *Bradley* analysis at all or else possibly revised prong (b) of the *Bradley* manifest injustice test from what appeared to be "vested rights" to any "substantive right or liability," *see Kaiser*, 110 S.Ct. at 1585 (Scalia, J. concurring). *But see id.* at 1593 (White, J., dissenting) (plaintiff did not have a "vested" right to postjudgment interest under the *Bradley* "manifest injustice" test). Given these ambiguous signals from the Court, we are inclined to agree with Justice Scalia's criticism that "manifest injustice" means "almost anything" and is in fact nothing more than "a surrogate for policy preferences." *Kaiser*, 110 S.Ct. at 1587 (Scalia, J., concurring).

*cal Corp. v. Bonjorno,* —— U.S. ——, ——, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990). The majority found that it did not need to reconcile the apparent conflict, however, "because under either view, where the congressional intent is clear, it governs." *Id.* The *Kaiser* court went on to hold that the plain language of the statute at issue evidenced clear congressional intent against retroactivity. *Id.* at 1577–78.

Having found in Part III.A. of this opinion that the language and legislative history of the Restoration Act do not evidence a clear congressional intent for or against its retroactive application, we have struggled in vain to reconcile the *Bradley* and *Bowen* lines of precedent. We have concluded, however, that under the circumstances of this case the *Bradley* and *Bowen* line of cases are in "irreconcilable contradiction," *see Kaiser,* 110 S.Ct. at 1579 (Scalia, J., concurring). Where congressional intent on retroactivity is ambiguous, we simply cannot harmonize the presumption that a new statute should be applied retroactively even if it "does not explicitedly recite that it is to be applied to pending cases," *Bradley,* 416 U.S. at 715, 94 S.Ct. at 2018, with the contrary presumption that "congressional enactments ... will not be construed to have retroactive effect unless their language requires this result," *Bowen,* 109 S.Ct. at 471. Application of either principle directly countermands the other in the situation where, as before us, congressional intent on retroactivity is unclear.

We recognize the possibility that even where congressional intent on retroactivity is unclear, application of either the *Bradley* or *Bowen* presumption may result in the same outcome by virtue of *Bradley*'s "manifest injustice" exception. *See supra* note 10. However, we agree with Justice Scalia's observation in *Kaiser* that "[i]n the rules of construction they announce, if not in the results they produce, these two lines of cases are ... in irreconcilable contradiction." *Kaiser,* 110 S.Ct. at 1579 (Scalia, J., concurring). In our view, the appropri-

ate legal analysis is to decide first whether the *Bradley* presumption applies before going on to analyze whether the case nevertheless falls within the "manifest injustice" exception. *See Bradley,* 416 U.S. at 711–21, 94 S.Ct. at 2016–21 (deciding first that presumption governs, then examining whether "manifest injustice" exception applies). Thus, we are faced squarely with the issue recognized but left unresolved in *Kaiser;* namely, when congressional intent on retroactivity is unclear, which presumption—*Bradley* or *Bowen*—is to govern?

Forced to elect between these contradictory presumptions, we choose *Bowen.* We find that the *Bowen* line of cases is well-entrenched in the history of the Supreme Court jurisprudence, whereas *Bradley* is largely unsupported by its cited authorities.

We are strongly persuaded by Justice Scalia's observation in his concurring opinion in *Kaiser* that the presumption of prospective application of statutes is supported by over 150 years of Supreme Court precedent, stretching from the early part of the nineteenth century to the middle of this century. *See Kaiser,* 110 S.Ct. at 1579–81 (Scalia, J., concurring) (citing in part: *United States v. Heth,* 7 U.S. (3 Cranch) 399, 413, 2 L.Ed. 479 (1806) ("Words in a statute ought not to have a retrospective operation, unless they are so clear, strong, and imperative, that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied"); *Miller v. United States,* 294 U.S. 435, 439, 55 S.Ct. 440, 442, 79 L.Ed. 977 (1935) ("[A] statute cannot be construed to operate retrospectively unless the legislative intention to that effect unequivocally appears")).

In contrast with this long line of precedent, with the exception of *Thorpe,* 393 U.S. 268, 89 S.Ct. 518, none of the cases cited by *Bradley* stand for the proposition that statutes are presumed to apply retroactively. Instead, the cited decisions involve either: the retroactive application of judicial decisions,[11] *see Vandenbark v. Ow-*

---

11. That judicial decisions operate retroactively lends no support to the argument that there is a

presumption for retroactive operation of statutes. *See United States v. Security Industrial*

*ens–Illinois Glass Co.,* 311 U.S. 538, 542, 61 S.Ct. 347, 349, 85 L.Ed. 327 (1941); *Patterson v. Alabama,* 294 U.S. 600, 607, 55 S.Ct. 575, 578, 79 L.Ed. 1082 (1935); *Sioux County v. National Surety Co.,* 276 U.S. 238, 240, 48 S.Ct. 239, 239, 72 L.Ed. 547 (1928); *Dorchy v. Kansas,* 264 U.S. 286, 291, 44 S.Ct. 323, 325, 68 L.Ed. 686 (1924); *Moores v. National Bank,* 104 U.S. 625, 629, 26 L.Ed. 870 (1882), the retroactive application of statutes that contain express language requiring this result, *see Dickinson Industrial Site, Inc. v. Cowan,* 309 U.S. 382, 383, 60 S.Ct. 595, 596, 84 L.Ed. 819 (1940); *Carpenter v. Wabash Ry. Co.,* 309 U.S. 23, 27, 60 S.Ct. 416, 418, 84 L.Ed. 558 (1940); *Stephens v. Cherokee Nation,* 174 U.S. 445, 477–78, 19 S.Ct. 722, 734, 43 L.Ed. 1041 (1899); *Freeborn v. Smith,* 69 U.S. (2 Wall.) 160, 162, 17 L.Ed. 922 (1865), a statute that must necessarily be applied prospectively because the dispute involves either injunctive relief, *see Dinsmore v. Southern Express Co.,* 183 U.S. 115, 120, 22 S.Ct. 45, 46, 46 L.Ed. 111 (1901), or a permit for future action, *see Ziffrin v. United States,* 318 U.S. 73, 78, 63 S.Ct. 465, 468, 87 L.Ed. 621 (1943), a case remanding to a state court in order for the *state court* to determine the effect of a newly enacted state statute, *see Missouri ex rel. Wabash Ry. Co. v. Public Service Comm'n,* 273 U.S. 126, 131, 47 S.Ct. 311, 313, 71 L.Ed. 575 (1927), a case involving the general rule that criminal penalties cannot be enforced following the repeal of the statute that proscribed the conduct giving rise to the penalty, *see United States v. Chambers,* 291 U.S. 217, 222–23, 54 S.Ct. 434, 435, 78 L.Ed. 763 (1934), and a case staying further proceedings where the outbreak of World War I, made it impossible for the citizen of a belligerent nation to continue to represent himself, *see Watts, Watts & Co. v. Unione Austriaca di Navigazione,* 248 U.S. 9, 22–23, 39 S.Ct. 1, 2–3, 63 L.Ed. 100 (1918). *See also Kaiser,* 110 S.Ct. at 1583–84 (Scalia, J., concurring) (discussing above cases).

*Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982) ("The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to ev-

The rule that, absent clear congressional intent to the contrary, statutes are presumed to apply prospectively was uncontroverted until the Supreme Court decided *Thorpe* in 1969. *See Kaiser,* 110 S.Ct. at 1581 (Scalia, J., concurring). *Thorpe* involved a federal regulation requiring landlords to inform tenants of the reasons for eviction. The *Thorpe* court retroactively applied the regulation and invalidated an eviction order issued eighteen months prior to the promulgation of the regulation. In contrast to the longstanding presumption of prospective application of statutes, *Thorpe* held that "[t]he general rule ... is that an appellate court must apply the law in effect at the time it renders its decision." *Thorpe,* 393 U.S. at 281, 89 S.Ct. at 525. In support of this rule, *Thorpe* cited five cases, four of which, *Vandenbark, Carpenter, Chambers,* and *Ziffrin,* we have already examined and found unsupportive. The fifth case *Thorpe* cited was *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), which involved the question of whether the United States could condemn a captured French vessel. After the lower court ruled in the affirmative, and before the Supreme Court heard the case, the United States entered into a convention with France providing for the return of French "property captured and not yet *definitively* condemned...." *Id.* at 103 (emphasis in original). The Court discussed the lower court's ruling and concluded that it did not constitute a "definitive" condemnation of the vessel within the meaning of the treaty:

> The argument at the bar which contends that because the sentence of the circuit court is denominated a final sentence, therefore its condemnation is definitive in the sense in which that term is used in the treaty, is not deemed a correct argument.... The last decree of an inferior court is final in relation to the power of that court, but not in relation to the property itself, unless it be acquiesced under. The terms used in the treaty

ery law student"). Judicial decisions operate retroactively because we generally regard them as an expression of pre-existing law. *See Kaiser,* 110 S.Ct. at 1582 (Scalia, J., concurring).

seem to apply to the actual condition of the property, and to direct a restoration of that which is still in controversy between the parties.... In this case the sentence of condemnation was appealed from. It might have been reversed, and therefore was not such a sentence as in the contemplation of the contracting parties, on a fair and honest construction of the contract, was designated as a definitive condemnation.

*Id.* at 108–09. On this basis, the Court stated: "if, subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed...." *Id.* at 110. The Court's reference to a law which "intervenes and positively changes the rule which governs" must be taken in context. The terms of law before the *The Schooner Peggy* Court required retroactive application to "all property captured and not yet definitively condemned" by the courts. Thus, under the actual facts of *The Schooner Peggy*, a change in the law while a case was pending was applied by the Supreme Court where by its terms, the law was to be applied retroactively to pending cases, a position entirely in keeping with the *Bowen* line of cases. *Thorpe* marked the first departure from this long line of precedent when it broadened the rule set forth in *The Schooner Peggy:* "*Thorpe* thus stands for the proposition that even where the inter[vening] law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." *Bradley*, 416 U.S. at 715, 94 S.Ct. at 2018.

We conclude that *Thorpe* rested its holding on cases that either offer no support for that proposition or lend support to the opposite proposition. Faced with a choice between the longstanding and authoritative *Bowen* line of precedent and *Bradley*, which has only *Thorpe* in support, we elect the presumption reflected in the more recent decision in *Bowen* that "[a] statute is deemed to be effective only for the future unless a contrary intent appears." *Kaiser*, 110 S.Ct. at 1588 (Scalia, J., concurring).

Our decision not to apply the *Bradley* presumption is supported by the Supreme Court's decision in *Bennett v. New Jersey*, 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985). *Bennett* involved an attempt by the Secretary of Education to recover from the state of New Jersey Title I funds that the Secretary of Education had determined New Jersey misused during the years 1970 to 1972. New Jersey argued, relying on *Bradley*, that the 1978 amendments to Title I, which relaxed the eligibility requirements for Title I funds, should be applied retroactively to determine whether the 1970–72 funds were misused. The Third Circuit agreed, and remanded the case to the Department of Education to determine whether the disputed expenditures conformed to the more lenient 1978 Title I standards. The Supreme Court reversed, concluding that the Third Circuit's reliance on the *Bradley* presumption was inappropriate.

Although *Bennett* in part based its holding on the unique contractual nature of the obligations arising under the Title I program, the Court also concluded that "*Bradley* itself suggest[s] that changes in substantive requirements for federal grants should not be presumed to operate retroactively." *Id.* at 638, 105 S.Ct. at 1559. The Court elaborated:

[The *Bradley*] holding rested on the general principle that a court must apply the law in effect at the time of its decision, which *Bradley* concluded holds true even if the intervening law does not expressly state that it applies to pending cases. *Bradley*, however, expressly acknowledged limits to this principle. "The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional." This limitation comports with another venerable rule of statutory interpretation, *i.e.*, that statutes affecting substantive rights and liabilities are presumed to have only prospective effect.

*Id.* at 639, 105 S.Ct. at 1560 (citations omitted).

In this case DeVargas seeks to impose substantive liability on the LANL defendants in their individual capacities through a retroactive application of the Restoration Act to section 504. As in *Bennett*, we find compelling grounds for not invoking *Bradley* where to do otherwise would conflict the "venerable rule of statutory interpretation, *i.e.*, that statutes affecting substantive rights and liabilities are presumed to have only prospective effect," *Bennett*, 470 U.S. at 639, 105 S.Ct. at 1560. *But see Leake*, 695 F.Supp. 1414, 1417 (E.D.N.Y.1988) (stating that the Restoration Act must be retroactively applied and *Bennett* is not controlling because the Restoration Act merely gives plaintiff a remedy to redress the violation of his rights), *aff'd*, 869 F.2d at 131 (affirming *Leake* for substantially the reasons given by the district court). We hold that the Restoration Act should not be applied retroactively.

## IV.

We next address the remaining federal defendant, Gary Granere, the Acting Area Manager for the DOE's LANL office. DeVargas states that his "only claim against any federal defendant on this appeal is that Defendant Granere failed to adequately perform his duty to properly administer the University of California—Mason & Hanger contract and failed to properly supervise the state and private defendants." We are uncertain whether DeVargas intends this statement to relate to his section 504 claim. Assuming arguendo that DeVargas can bring a section 504 suit against a federal employee for nonintentional conduct, we conclude that the analysis applicable to the individual

LANL defendants is equally applicable here. Prior to the Restoration Act, section 504 was program-specific and did not encompass the actions of Granere. We affirm the dismissal of DeVargas's claims against Granere.

## V.

We rest our holding that the district court properly dismissed DeVargas's section 504 claim on the applicable law and the intent of Congress. We therefore conclude that further factual development was unnecessary and that the district court did not abuse its discretion in rejecting DeVargas's request for further discovery under Federal Rule of Civil Procedure 56(f). *See Patty Precision v. Brown & Sharpe Mfg. Co.*, 742 F.2d 1260, 1264 (10th Cir.1984) (reviewing trial court's Rule 56(f) determination under an abuse of discretion standard).[12]

## VI.

We now address DeVargas's argument that the application of IMD 6102 constituted a deprivation of his clearly established right to substantive due process of law under the fifth and fourteenth amendments. In *DeVargas I* we rejected a similar argument: that the application of IMD 6102 violated DeVaragas's clearly established rights under the equal protection clause of the fourteenth amendment. *See DeVargas I*, 844 F.2d 714 (10th Cir.1988). *DeVargas I* ruled that because the defendants' actions did not implicate a fundamental constitutional right, there could be no constitutional violation if there was a rational relationship between the govern-

---

12. Because of our holding in this case, we need not resolve the open issue of whether section 504 permits the recovery of monetary damages for intentional discrimination. *Compare Smith v. Robinson*, 468 U.S. 992, 1020 n. 24, 104 S.Ct. 3457, 3472 n. 24, 82 L.Ed.2d 746 (1984) ("Without expressing an opinion on the matter, we note that courts generally agree that damages are available under § 504.") *and Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1107 (9th Cir.1987) (assuming availability of damages) *and Carter v. Orleans Parish Pub. Schools*, 725 F.2d 261, 264 (5th Cir.1984) (per curiam) (assuming availability of damages

for intentional violations) *and Miener v. Missouri*, 673 F.2d 969, 977–79 (8th Cir.), *cert. denied*, 459 U.S. 909, 916, 103 S.Ct. 215, 239, 74 L.Ed.2d 171 (1982) *with Board of Educ. of E. Windsor Regional School Dist. v. Diamond*, 808 F.2d 987, 996 n. 5 (3d Cir.1986) (reserving question) *and Manecke v. School Bd. of Pinellas County*, 762 F.2d 912, 921–22 & n. 8 (11th Cir. 1985) (availability of damages an "open" and "murky" question), *cert. denied* 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986) *and Hurry v. Jones*, 734 F.2d 879, 886 (1st Cir.1984) (reserving question).

mental objective and the conduct in question. We held that it was rational for the DOE to conclude that fully sighted persons would more capably guard the nuclear and classified material at LANL than persons with visual handicaps. *See DeVargas I,* 844 F.2d at 725.

■ We engage in a similar analysis for a substantive due process challenge. *See Oklahoma Ed. Ass'n v. Alcoholic Beverage Enforcement Comm'n,* 889 F.2d 929, 935 (10th Cir.1989). We first determine whether IMD 6102 infringes on any fundamental constitutional right. We conclude that it does not. *See id.; Coleman v. Darden,* 595 F.2d 533, 538 (10th Cir.) (no fundamental constitutional right to government employment), *cert. denied* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979); *Oklahoma Ed. Ass'n,* 889 F.2d at 932–33 (no fundamental constitutional right to private employment). We also note that IMD 6102 is not like the statutory conclusive presumption struck down in *Cleveland Board of Education v. LaFluer,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), which required school teachers to take maternity leave without pay beginning five months before the expected birth of child. *LaFluer* rested on the importance of restricting governmental intrusion into "matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.* at 640 (quoting *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972)). *See also Weinberger v. Salfi,* 422 U.S. 749, 771, 95 S.Ct. 2457, 2469, 45 L.Ed.2d 522 (1975). There is no governmental intrusion concerning a fundamental right at issue in this case. We therefore require only that IMD 6102 bear a rational relationship to a legitimate governmental purpose, *see Oklahoma Ed. Ass'n,* 889 F.2d at 935. The governmental concern with protecting the classified and nuclear material at LANL, together with "the logical inference that a fully sighted person may perform those security functions more capably than an individual only partially sighted, go far to show such a rational basis." *DeVargas I,* 844 F.2d at 725.

## VII.

Finally, we address DeVargas's claim under 42 U.S.C. section 1983. Because there is no violation of either section 504 of the Rehabilitation Act or substantive due process under the Constitution, no violation of law exists upon which DeVargas may rest a section 1983 suit. We hold that the district court properly dismissed the section 1983 claim.

## VIII.

We AFFIRM the district court's grant of summary judgment in favor of the defendants.